

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ OCT 2 7 2015 ★

BROOKLYN OFFICE

MEMORANDUM

To:     Judge Gleeson
From:   Samia Hossain
Re:     U.S. Attorney reentry efforts            15 mc 1174
Date:   October 26, 2015

## QUESTION

You asked me to research what instructions or information the Department of
Justice has communicated to reentry coordinators at U.S. Attorney Offices ("USAO") across the
country. In addition, you asked me to look into what the U.S. Attorneys in different districts are
doing to help individuals with criminal records obtain jobs and successfully reenter society.

## DISCUSSION

As a result of the burgeoning prison population in the United States, Attorney
General Eric Holder launched a comprehensive review of the criminal justice system in early
2013.[1] The Justice Department outlined its findings in a report, entitled *Smart on Crime*, which
stated that "the consequences of a criminal conviction can remain long after someone has served
his or her sentence" and that "[r]ules and regulations pertaining to formerly incarcerated people
can limit employment and travel opportunities, making a proper transition back into society
difficult."[2] The report identified five goals for reform that, if achieved, would better ensure that
federal laws are more fairly and efficiently enforced.[3] One of these goals was to "bolster . . .
reentry efforts to deter crime and reduce recidivism."[4] As part of the new initiative, each U.S.
Attorney was required to designate a reentry coordinator in his or her district who will work "to
avoid the imposition of unnecessary collateral consequences upon the conviction of criminal
offenses" and to "also consider whether or not [new] regulations can be more narrowly tailored
to prevent collateral consequences that would prevent reentry."[5] The Executive Office of U.S.
Attorneys was asked to periodically report on the progress of USAOs on the reentry front.[6]

---

[1]      U.S. Dep't of Justice, *About the Smart on Crime Initiative* (Oct. 22, 2014), http://www.justice.
gov/ag/attorney-generals-smart-crime-initiative.
[2]      U.S. Dep't of Justice, *Smart on Crime: Reforming the Criminal Justice System for the 21st
Century (Smart on Crime)* (Aug. 2013) 5, http://www.justice.gov/sites/default/files/ag/legacy/2013/08/12/smart-on-
crime.pdf.
[3]      The five goals are: 1) to ensure finite resources are devoted to the most important law enforcement
priorities; 2) to promote fairer enforcement of the laws and alleviate disparate impacts of the criminal justice system;
3) to ensure just punishments for low-level, nonviolent convictions; 4) to bolster prevention and reentry efforts to
deter crime and reduce recidivism; and 5) to strengthen protections for vulnerable populations. *Id.* at 1.
[4]      *Id.*
[5]      U.S. Dep't of Justice, *Smart on Crime Fact Sheet*,
http://www.justice.gov/sites/default/files/ag/legacy/2014/04/11/ag-smart-on-crime-fact-sheet.pdf.
[6]      *Smart on Crime, supra* n.2, at 5.

1

Furthermore, an annual "Director's Award for prevention and reentry" was established to recognize nationally significant work in reentry services.[7]

To support this effort, Congress allocated "$15 million for prisoner reentry programs and Reentry Coordinators in the United States Attorneys' offices" in FY 2015.[8] As of 2013, the Justice Department itself awarded over $62 million in grants through the Second Chance Act, $57 million of which was to support "smart probation projects . . . adult and juvenile reentry demonstration projects; adult mentoring programs; technology career training projects for incarcerated adults and juveniles," among other efforts.[9] The Department also collaborated with the American Bar Association to create a national inventory of collateral consequences facing formerly incarcerated people.[10] In a memorandum sent to all U.S. Attorneys and Department of Justice components, General Holder instructed all federal prosecutors to factor these collateral consequences into their policies.[11] He noted that "one consideration could be time limits on certain collateral consequences imposed by statutes so that formerly incarcerated individuals are not subjected to lifelong penalties after they have completed their term of incarceration."[12]

The most relevant and comprehensive set of guidelines communicated from the Department of Justice to reentry coordinators in individual USAOs is in the Reentry Toolkit for United States Attorneys' Offices.[13] The Toolkit details the role of the cabinet-level Federal Interagency Reentry Council, which was first convened by General Holder in January 2011 and "represents a significant federal commitment to coordinate efforts" to address reentry challenges.[14] The Council works "to identify federal policy opportunities and barriers to improve outcomes for the reentry population" and "to promote federal . . . practice changes that focus on reducing crime and improving the well-being of formerly incarcerated individuals, and their families and communities[.]"[15] Specifically with regard to employment, the "Council is working to reduce barriers to employment, so that people with past criminal involvement – after they have been held accountable and paid their dues – can compete for appropriate work

---

[7] U.S. Dep't of Justice, *Reentry Toolkit for United States Attorneys' Offices* (*Reentry Toolkit*) (March 2014) 2, https://csgjusticecenter.org/documents/0000/1163/Reentry_Council_Reentry_Toolkit.pdf.
[8] The White House, *The Budget for Fiscal Year 2015, Dep't of Justice* 103, https://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/justice.pdf.
[9] U.S. Dep't of Justice, *Justice Department Announces More than $62 Million to Strengthen Reentry, Probation and Parole Programs* (Nov. 14, 2013), http://www.justice.gov/opa/pr/justice-department-announces-more-62-million-strengthen-reentry-probation-and-parole-programs.
[10] *See* American Bar Ass'n, *ABA National Inventory of Collateral Consequences of Conviction* (2013), http://www.abacollateralconsequences.org/map/.
[11] Attorney General Eric Holder, *Memorandum to Heads of Department of Justice Components and U.S. Attorneys* (Aug. 12, 2013), http://www.justice.gov/sites/default/files/ag/legacy/2014/04/11/ag-memo-collateral-consequences.pdf.
[12] *Id.* at 2.
[13] *See gen., Reentry Toolkit, supra* n.7.
[14] *Id.* at 3.
[15] *Id.* at 4.

2

opportunities in order to support themselves and their families, pay their taxes, and contribute to the economy."[16]

The Toolkit also includes an overview of the obstacles facing individuals who have convictions on their records – including employment,[17] and barriers specific to women[18] – as well as a summary of notable federal reentry initiatives focused on those challenges. The Justice Department has stated that reentry efforts "are well within the mainstream of the U.S. Attorney's convening power, and are clearly welcomed and encouraged by the Attorney General."[19] "USAOs can play an important role in improving employment outcomes and lowering recidivism for formerly incarcerated individuals,"[20] and the Toolkit highlights a few offices that have made strides toward those goals:

- The USAO for the Southern District of Alabama hosts an employment job fair program every year[21] as "the result of persistent effort on the part of the U.S. Attorney," Kenyen Brown.[22] The USAO partners with the Federal Public Defender, the Mobile Chamber of Commerce, and a regional workforce development council to host the fair and to meet with potential employers about federal tax credits that may be available to them for hiring formerly incarcerated individuals.[23] The USAO has also found an interested partner in Dough Burris, the Chief Probation Officer in the Eastern District of Missouri.[24]

- The District of Columbia USAO "has sought to be a leader in the Justice Department's efforts to support the reentry of former offenders."[25] Under the direction of former U.S. Attorney Ronald Machen,[26] the office partnered with federal and local agencies, as well as community-based organizations, to host Employer Reentry Forums to educate business leaders and the community about the importance of supporting people who are returning from prison.[27] The office also sponsored two unique symposia, in 2011 and 2013, to specifically address the needs of women making the transition from incarceration into the community, and to raise public awareness on that set of issues.[28]

---

[16]   *Id.*
[17]   *Id.* at 4, 11.
[18]   *Id.* at 5-6, 12.
[19]   *Id.* at 7.
[20]   *Id.* at 11.
[21]   U.S. Att'ys Office for the S. Dist. of Ala., *Ex-Offender Re-Entry Initiative* (Aug. 14, 2015), http://www.justice.gov/usao-sdal/programs/ex-offender-re-entry-initiative.
[22]   *Reentry Toolkit, supra* n.7, at 11.
[23]   *Id.*
[24]   *Id.*
[25]   U.S. Att'ys Office for the Dist. of Columbia, *Community Engagements* (Feb. 25, 2015), http://www.justice.gov/usao-dc/programs/community-prosecution/community-engagements#ro.
[26]   Mr. Machen resigned on March 31, 2015 and has been succeeded by Vincent Cohen, Jr.  U.S. Att'ys Office for the Dist. of Columbia, *About the U.S. Attorney*, http://www.justice.gov/usao/district/dc.
[27]   *Id.; see also Reentry Toolkit, supra* n.7, at 12.
[28]   *Reentry Toolkit, supra* n.7, at 13; *see also* U.S. Att'ys Office for the Dist. of Columbia, *Press Release: Community Forum will Highlight Challenges Facing Women Returning Home from Jail or Prison* (Apr. 6, 2011), http://www.justice.gov/archive/usao/dc/news/2011/apr/11-131.pdf.

3

Other employment efforts of note include:

- On April 17, 2014, U.S. Attorney Paul Fishman for the District of New Jersey gave a keynote address at the Prisoner Reentry: Breaking the Cycle Conference sponsored by the Jersey City Mayor, Steven Fulop, and local groups.[29] He spoke about the challenges facing those with convictions on their records, and spoke at length about the "ReNew" program, "the first federal reentry court in New Jersey."[30] The program invites formerly incarcerated individuals to the courthouse every Tuesday, where:

> members of [the U.S. Attorney's Office] and court personnel [edit former offenders'] resumes, [teach] them how to interview for a job, and [offer] to tutor them in math. The judge [helps] them to register for college, find apartments, and get jobs – and [] literally [takes] them to a charter school to help them enroll their kids. Now that they have served their time, those defendants are being asked by lawyers and staff from that same U.S. Attorney's office [i.e., the one that advocated for their incarceration] and by a federal judge working with probation officers and public defenders, 'What do you need?'[31]

Mr. Fishman spoke at the Prisoner Reentry Conference again this year, along with Mike Tyson and former New York City Police Commissioner Bernard Kerik.[32]

- On February 5, 2014, former U.S. Attorney for the Northern District of Georgia (and current Deputy Attorney General) Sally Yates hosted a Summit on Reentry in partnership with the Governor's Office of Transition, Support and Reentry.[33] The purpose of the summit was to convene the business community, the USAO, and formerly incarcerated people to correct public perceptions and dispel myths that affect reentry prospects.[34] Under Ms. Yates's leadership, the USAO initiated the "New Beginnings" program, which operates through the guidance of various local stakeholders and offers an eight-week

---

[29]     Integrity House, *Prisoner Reentry: Breaking the Cycle Conference to be Hosted by Jersey City Mayor Steven Fulop* (Apr. 10, 2014), http://patch.com/new-jersey/riverdell/prisoner-reentry-breaking-the-cycle-conference-to-be-hosted-by-jersey-city-mayor-steven-fulop_0b139be9.

[30]     U.S. Att'ys Office for the Dist. of N.J., *Remarks as Prepared for Delivery by U.S. Attorney Paul J. Fishman at the Prisoner Reentry: Breaking the Cycle Conference* (Apr. 17, 2014), http://www.justice.gov/usao-nj/pr/remarks-prepared-delivery-us-attorney-paul-j-fishman-prisoner-reentry-breaking-cycle.

[31]     *Id.*

[32]     Melissa Bilecky, *Mike Tyson, U.S. Attorney Fishman, Others Speaking at Jersey City Prisoner Reentry Conference* (Apr. 1, 2015), http://www.nj.com/jjournal-news/index.ssf/2015/04/us_attorney_fishman_boxing_cha.html.

[33]     U.S. Att'ys Office for the N. Dist. of Ga., 2014 Reentry Summit (Apr. 20, 2015), http://www.justice.gov/usao-ndga/community-outreach/reentry-summit.

[34]     *Id.*

curriculum followed by an intensive job search component.[35] The program currently has space for 15 formerly incarcerated individuals.[36] Under the leadership of current U.S. Attorney John Horn, the office continues to partner with local organizations and initiatives to provide training and assistance for individuals reentering society.[37] It also hosts and attends seminars and events to share information and garner support for reentry programs.[38]

- The USAO for the Western District of Virginia, presently led by U.S. Attorney Anthony Giorno, has established two reentry courts.[39] In Abingdon, the court holds a monthly session for probationers with addiction challenges.[40] In Roanoke, a court is "held for probationers who are challenged in today's tough economy and are working to improve their marketable skills."[41] The Roanoke program also holds a pre-trial session to meet the needs of addicted veterans.[42] In addition, the USAO supports reentry programs around the district "by sharing and providing information and resources with reentry service providers."[43]

- In October 2013, U.S. Attorney Danny Williams in the Northern District of Oklahoma launched the Fresh Start Reentry Program.[44] The program helps individuals with felony convictions obtain resources through the USAO's collaboration with reentry partners and local businesses, including a Resource Fair hosted in August 2015.[45]

## CONCLUSION

The Justice Department's Smart on Crime initiative demonstrates a commitment to addressing the collateral consequences of convictions and incarceration on individuals reentering society. U.S. Attorneys across the country have made concerted efforts to assist those individuals obtain jobs and get back on their feet. General Holder has stated, "[Reentry] work is, and will remain, a top priority throughout the country. And my colleagues and I will keep working closely with state leaders, agency partners, including members of the Federal Interagency Reentry Council – and groups like the American Bar Association – to extend these

---

[35]     U.S. Att'ys Office for the N. Dist. of Ga., *New Beginnings* (Apr. 17, 2015), http://www.justice.gov/usao-ndga/community-outreach/new-beginnings.
[36]     *Id.*
[37]     U.S. Att'ys Office for the N. Dist. of Ga., *Community Outreach* (Apr. 20, 2015), http://www.justice.gov/usao-ndga/community-outreach.
[38]     *Id.*
[39]     U.S. Att'ys Office for the W. Dist. of Va., *Community Outreach* (Sept. 14, 2015), http://www.justice.gov/usao-wdva/community-outreach#reentry.
[40]     *Id.*
[41]     *Id.*
[42]     *Id.*
[43]     *Id.*
[44]     U.S. Att'ys Office for the N. Dist. of Okla., *U.S. Attorney's Office Sponsors Fresh Start Reentry Resource Fair* (Aug. 26, 2015), http://www.justice.gov/usao-ndok/pr/us-attorneys-office-sponsors-fresh-start-reentry-resource-fair.
[45]     *Id.*

efforts. . . . Ultimately, this is about much more than fairness for those who are released from prison. It's a matter of public safety and public good. It makes plain economic sense. It's about who we are as a people." [46]

---

[46]       U.S. Dep't of Justice, *Attorney General Eric Holder Delivers Remarks at the Annual Meeting of the American Bar Association's House of Delegates* (Aug. 12, 2013), http://www.justice.gov/opa/speech/attorney-general-eric-holder-delivers-remarks-annual-meeting-american-bar-associations.

DOJ Reentry Toolkit
for USAOs

U.S. Department of Justice

# Reentry Toolkit

## for

## United States Attorneys' Offices



## March 2014



**Office of the Attorney General**

Washington, D.C. 20530

March 21, 2014

MEMORANDUM FOR ALL UNITED STATES ATTORNEYS

FROM:              THE ATTORNEY GENERAL

SUBJECT:            Second Edition of the Reentry Toolkit

     I am pleased to present you with the second edition of the "Reentry Toolkit for United States Attorneys' Offices." The Department's "Smart on Crime" initiative recognizes the important role that reentry plays in lowering recidivism and increasing public safety in communities across the country. United States Attorneys are uniquely positioned to initiate reentry efforts. Your day-to-day relationships with the judiciary afford you the opportunity to discuss and encourage implementation of reentry courts and, where appropriate, pre-incarceration "drug courts." Similarly, your power to convene community leaders and criminal justice stakeholders in your district provides you with an unparalleled opportunity to engage in "reentry outreach" efforts.

     As a result of the "Smart on Crime" initiative, every office has now designated a "Prevention and Reentry Coordinator," and the Toolkit should bolster your efforts and the work of your coordinators. You will see that the examples in this Toolkit are drawn from United States Attorneys' offices around the country, and can help your office develop or expand its reentry efforts. Included are program documents, meeting agendas, training materials, press examples, grant information, and staffing suggestions. Also included is a new section on pre-incarceration diversion programs or "drug courts," as well as new sections addressing the impact of financial penalties and interest accrued during incarceration, and reentry in Indian Country. The toolkit describes a variety of reentry outreach efforts, including the establishment of reentry stakeholder coalitions and "reentry summits," hosting seminars for employers on the benefits of hiring formerly incarcerated individuals, and working with local bar associations to encourage pro bono assistance for returning citizens.

     I encourage you to use this new, revised edition of the Toolkit to help you undertake and expand the reentry efforts in your district.

# Table of Contents

**I.**   **Introduction: Solidifying Reentry within United States Attorneys' Offices**...................................1

**II.**   **The Federal Interagency Reentry Council** ...................................................................3

The Goals of the Reentry Council....................................................................................4

Scope of Reentry............................................................................................................4

Reentry MythBusters .....................................................................................................6

**III.**   **Having a Wider Impact: USAO Reentry Programs that Affect States, Localities, and Tribes**....7

Reentry Summits, Networks, and Coalitions ..................................................................7

Notification and Call-in Programs .................................................................................10

Specific Issues ...............................................................................................................11

Employment..............................................................................................................11

Reentry for Women ...................................................................................................12

Fines and Fees as a Barrier to Reentry .....................................................................13

Reentry in Indian Country .........................................................................................15

Bureau of Prisons......................................................................................................17

**IV.**   **Federal Reentry Initiatives in U.S. District Courts** ...................................................18

Post-Incarceration - Reentry Court Operations.............................................................19

Programs for Substance Abusers...............................................................................20

Programs for Those with a High Risk of Recidivism ...................................................21

Program Targeting Gang Membership.......................................................................21

Program for those with Mental Health Issues...........................................................21

Program Targeting Veterans' Issues .........................................................................22

Diversion-Based Court Programs...................................................................................22

Substance Abuse (Drug Court) .................................................................................22

Alien Smuggling ........................................................................................................23

Veterans Court ..........................................................................................................24

Indian Country...........................................................................................................24

**V.**   **The USAO Role in Reentry Grant Opportunities for State and Local Partners** ..........................25

**VI.**   **USAO Reentry Staffing Considerations** ...................................................................26

**VII.**   **Additional Resources, Training, and Other Materials** ...................................................27

# I.  Introduction: Solidifying Reentry within United States Attorneys' Offices

> "The bottom line is that, while the aggressive enforcement of federal criminal statutes remains necessary, we cannot simply prosecute or incarcerate our way to becoming a safer nation. To be effective, federal efforts must also focus on prevention and reentry. We must never stop being tough on crime. But we must also be smart and efficient when battling crime and the conditions and the individual choices that breed it. Ultimately, this is about much more than fairness for those who are released from prison. It's a matter of public safety and public good. It makes plain economic sense. It's about who we are as a people."
>
> — **Attorney General Eric H. Holder, Jr.**
> Address to the American Bar Association, August 12, 2013

Over the past several years, many U. S. Attorneys' offices (USAOs) have undertaken creative and important efforts to help formerly incarcerated individuals successfully reenter society. These efforts have resulted in a number of significant successes, as the examples in this toolkit show. With the implementation of the August 2013 "Smart on Crime" initiative, Justice Department leadership has doubled down on reentry. DAG Anti-Violence/Reentry Memo Aug 2013 It is clear that going forward this work is to be considered both an essential and a permanent part of the USAOs' public safety mission.

The "Smart on Crime" initiative serves to institutionalize reentry and prevention, including creative diversion practices, into the fabric of everyday USAO work. It is the culmination of a series of policy shifts in favor of reentry initiatives and drug courts that have occurred within the Department of Justice over the last several years. In 2006, Department policy discouraged drug courts and reentry efforts in the federal system. Since then, the following steps have been taken:

- In August 2010 this Attorney General stated that reentry programs were moving "from the margins to the mainstream" both for the Department of Justice

and for state and local criminal justice systems. http://usanetsp.usa.doj.gov/staffs/ctd/Documents/AG_10_8_10.pdf.

- In November 2010 the USAO community put forth a renewed Anti-Violence Strategy. This three-pronged strategy squarely incorporated reentry, along with enforcement and prevention, as keys to USAO success. http://usanetsp.usa.doj.gov/staffs/ctd/Documents/anti_viol_strat.pdf.

- In January 2011 the Deputy Attorney General issued a memorandum encouraging USAOs to participate in reentry courts. http://usanet.usa.doj.gov/memos/memorandum.cfm?Memo_ID=5079. This memorandum formally reversed the Department's prior policy that "drug courts" were generally inappropriate and unnecessary in the federal system.

- In April 2011 the Department removed the existing prohibition against offering diversion to substance abuse addicts.

- In speeches throughout 2011, 2012 and 2013, Department leadership encouraged the use of

Table of Contents

reentry initiatives as well as diversion, "front-end" drug courts.

AG April 2011
AG June 2011
DAG Oct 2012
DAG June 2012 Ohio
DAG June 2012 Coleman
DAG May 2012
DAG July 2013

As part of the "Smart on Crime" initiative each USAO is required to designate a "Prevention and Reentry Coordinator." This position will typically be a collateral duty that may be filled by an AUSA or a support staff person. It is intended to ensure that at least one person in each USAO is undertaking, overseeing, or tracking the reentry and prevention work of the office. EOUSA will, in connection with future resource allocation processes, recognize and account in some way for this work. Time spent on reentry work is to be identified with a USA-5A code specific to reentry. Finally, an annual Director's Award for prevention and reentry has been established to recognize nationally significant work in this area.

EOUSA Memo Supporting Reentry

The "Smart on Crime" initiative was based on the Department's 2013 comprehensive review of the criminal justice system, undertaken with a view toward identifying ways to more fairly and cost-effectively enforce the law. The need for such a comprehensive review was clear. Over the past three decades, while the national crime rate has dropped, the national rate of incarceration and the annual cost of the criminal justice system have skyrocketed. In 2010, the annual cost to maintain the local, state and federal prison systems amounted to approximately $80 billion. Moreover, the federal prison population has grown by almost 800 percent over 30 years.

These increases simply cannot be maintained. Overcrowded prisons and the high cost of the justice system have reached crisis proportions across the country. The federal prison system is currently operating at about 40 percent above capacity. Several state prison systems have been subject to court-ordered expedited releases of prisoners due to constitutionally impermissible prison overcrowding. A well-known study by the Pew Charitable Foundation in 2011 found that one in 100 adult Americans are incarcerated. PEW April 2011 Study. Well over 600,000 individuals are released from state and federal prisons each year. Of these, 40 percent of federal inmates and 60 percent of state prison inmates will re-offend within three years after leaving prison. Ultimately, 95 percent of incarcerated individuals will be released back into the community.

Clearly, given the high cost of incarceration and the high rates of recidivism, reentry deserves our attention. If the rate of recidivism can be reduced, even by just a few percentage points, the impact on society can be profound. It is toward that end that the reentry and diversion efforts chronicled in this toolkit were undertaken.

Table of Contents

# II.   The Federal Interagency Reentry Council

Reentry is a priority for many of the cabinet agencies in President Obama's administration. Federal agencies are funding reentry efforts in communities all around the country, through the Second Chance Act and many other funding streams. In addition, the Obama administration is working across agencies to coordinate and advance efforts through a cabinet-level Reentry Council. The Reentry Council website is available at CSG Justice Center FIRC.

First convened by the Attorney General in January 2011, the Reentry Council represents a significant federal commitment to coordinate efforts and develop effective policies to address reentry challenges. FIRC overview

**The Reentry Council includes the following agencies:** Department of Justice; Department of Interior; Department of Agriculture; Department of Labor; Department of Health and Human Services; Department of Housing and Urban Development; Department of Education; Department of Veterans Affairs; Office of National Drug Control Policy; Social Security Administration; Domestic Policy Council; Equal Employment Opportunity Commission; White House Office of Faith-Based and Neighborhood Partnerships; Office of Personnel Management; Office of Management and Budget; Internal Revenue Service; Federal Trade Commission; Interagency Council on Homelessness; Small Business Administration; and the Court Services and Offender Supervision Agency.

At its first meeting the Council adopted a reentry mission statement. The Council aims to (1) make communities safer by reducing recidivism and victimization, (2) help those returning from prison and jail become productive citizens, and (3) save taxpayer dollars by lowering the direct and collateral costs of incarceration. The Council also empowered staff – now representing 20 federal departments and agencies – to work towards a number of goals.



Table of Contents

# The goals of the Reentry Council are:

- to identify research and evidence-based practices, policies, and programs that advance the Reentry Council's mission around prisoner reentry and community safety;

- to identify federal policy opportunities and barriers to improve outcomes for the reentry population;

- to promote federal statutory, policy, and practice changes that focus on reducing crime and improving the well-being of formerly incarcerated individuals, and their families and communities;

- to identify and support initiatives in the areas of education, employment, health, housing, faith, behavioral health treatment, and family and community well-being that can contribute to successful outcomes for formerly incarcerated individuals;

- to leverage resources across agencies that help this population become productive citizens and reduce recidivism and victimization; and

- to coordinate messaging and communications about prisoner reentry and the Obama Administration's response to it.

# Scope of Reentry

Reentry is clearly a public safety issue, but it also impacts a much broader array of public policy scenarios. **The Reentry Council has created a series of "snapshots" that describe the issues as well as Council accomplishments in the following areas: employment, education, housing, public safety, veterans, child support, womens' reentry and tribal reentry.** FIRC Snapshots

Following are a series of additional facts concerning the broader implications of reentry policy.

## Public Safety

Approximately two million adults are incarcerated in state prisons and local jails, costing U.S. taxpayers about $80 billion each year. The vast majority of these individuals eventually return to their home communities. In fact, each year well over 600,000 individuals are released from state prisons. Millions more cycle through local jails. Nationally, two out of every three people released from state prisons are rearrested for a new offense and about half are reincarcerated within three years. When reentry fails, the societal and economic costs are high. Reducing recidivism – a central goal of the Reentry Council – is critical for increasing long-term public safety and lowering corrections costs.

## Employment

Two out of every three men were employed before they were incarcerated, and many were the primary financial contributors in their households. Individuals who have been incarcerated can expect their future annual earnings to be reduced by some 40 percent after they return to their communities. The Reentry Council is working to reduce barriers to employment, so that people with past criminal involvement – after they have been held accountable and paid their dues – can compete for appropriate work opportunities in order to support themselves and their families, pay their taxes, and contribute to the economy.

## Health

While many prisoners receive the treatment and care they need while incarcerated, some do not, and there is often a lack of continuity in care from inside the prison to care in the community. For example, approximately two-thirds of people in prison meet criteria for substance abuse or dependence, but less than 15 percent of these individuals receive treatment after admission. Twenty-four percent of individuals in state prisons have a recent history of mental illness, but only 34 percent of inmates with mental health problems report receiving any treatment after admission. Additionally, individuals released from prisons and jails represent a substantial share of the U.S. population carrying communicable diseases,

Table of Contents

accounting for nearly one-quarter of the general population living with HIV or AIDS, almost one-third of those with hepatitis C, and nearly 40 percent of people with tuberculosis. The Reentry Council is working to ensure that the opportunities provided by the Affordable Care Act and other reforms will significantly increase access to appropriate physical and behavioral health interventions after release from incarceration, potentially reducing public health and public safety risks.

## Education

In a major federal study of individuals released from state prisons, 94 percent of incarcerated adults nearing release identified education as a key reentry need. Most incarcerated adults had not completed high school, although many have subsequently earned equivalency diplomas. Education is a core resource for release preparation, and is an evidence-based tool for reducing recidivism among adults and juveniles. For example, empirical research in the federal prison system, where literacy education programming is mandatory for most inmates, has demonstrated that participation in education programming is associated with a 16 percent reduction in recidivism. Education is also a critical building block for increasing employment opportunities.

## Housing

Stable housing with appropriate supportive services is a key factor in preventing homelessness and reducing recidivism. Reentry Council agencies are collaborating to advance policies, programs, and models that support stable housing and reentry services for those with criminal histories so they can successfully reenter their communities, and if appropriate, reunite with their families. Agencies are working together to reduce barriers to public and subsidized housing, and advance promising models that improve outcomes for people who repeatedly use corrections and homeless services.

## Justice-involved Veterans

Veterans are not overrepresented in the criminal justice system, but their numbers are significant. An estimated one of every ten criminal defendants and inmates has served in the U.S. military. Most justice-involved veterans are eligible for health care and other benefits from the U.S. Department of Veterans Affairs (VA), although their eligibility is suspended or reduced while they are incarcerated.

## Child Support

The child support program serves one in four of all children in the United States and one in two of all poor children and their families, serving those families from a child's birth until adulthood. Child support is available nationwide, but policies and practices vary from state to state. Child support is particularly important to reentry because child support obligations typically do not automatically stop during incarceration or unemployment. Realistic child support policies help parents provide for their families and facilitate successful reentry and can provide an on-ramp to many other supportive services.

## Women and Reentry

Justice-involved females, like males, face a host of challenges when they leave jail or prison and return to their communities. However, the current systems do not always address the specific challenges faced by women. For example, while many justice-involved females struggle with both substance abuse and mental illness – often linked to their history of physical or sexual abuse beginning in childhood and extending into adulthood – most state and local reentry programs lack a significant trauma-informed behavioral health component. And while a primary consideration for many justice-involved women who are mothers is to determine how to successfully reestablish a relationship with their children when they leave prison, most state and local systems are not focused on supporting this important aspect of reentry. These and many other factors point to the need to better

Table of Contents

identify effective strategies to help women overcome these challenges as they transition to their communities.

### Reentry in Indian Reservation Communities

The Reentry Council aims to identify the additional challenges faced by individuals reentering reservation communities due to the increased poverty and isolation often found there and to then identify and develop policies, programs, and services that will support the cultural-social fabric and increase the employment, education, and health and housing opportunities for this population.

# Reentry MythBusters

Reentry MythBusters are a product of the Federal Interagency Reentry Council. They are fact sheets designed to clarify existing federal policies that affect formerly incarcerated individuals and their families in a wide variety of areas such as public housing, access to benefits, parental rights, and employer incentives. Some federal laws and policies are more narrowly interpreted than is commonly perceived, as is the case with public housing and food assistance



benefits. In several policy areas, states and localities have broad discretion to determine how policies are applied and have various opt-out provisions --Temporary Assistance for Needy Families (TANF), formerly known as "welfare" and child support, for example. In some cases, statutory barriers do not exist at all or are very limited, as is the case with federal hiring. In fact, some federal policies and practices contain incentives for assisting the formerly convicted population such as federal bonding and tax incentives for employers hiring former prisoners. MythBusters

**Reentry MythBusters are helpful to a variety of reentry stakeholders with which the USAOs interact, such as the following:**

- Prison, jail, probation, community corrections and parole officials who want to ensure that individuals can access federal benefits, as appropriate, immediately upon release to help stabilize the critical first days and weeks after incarceration. Pre-release applications and procedures are available for certain federal benefits (Veterans, Social Security, food assistance, and student financial aid).

- Reentry service providers and faith-based organizations who want to know how to access the laws and policies related to public housing, supplemental nutrition (SNAP) benefits, federal student financial aid, and Veterans, Social Security, and TANF benefits. The Reentry MythBusters also describe child support options, parental rights while incarcerated, and the appropriate use of criminal histories in hiring decisions.

- Employers and workforce development specialists who are interested in the incentives and protections involved in hiring formerly convicted individuals. The Reentry MythBusters are also helpful to employers (including federal agencies) who want to better understand the appropriate use of a criminal record in making hiring decisions.

- States and local agencies that want to understand, modify, or eliminate certain bans on benefits such as TANF or SNAP (food stamps) for people who have been convicted of drug felonies.

In summary, reentry issues are complex and overlapping. An effective response to reentry challenges must therefore be multifaceted and involve multiple service delivery systems working together.

Table of Contents

# III. Having a Wider Impact: USAO Reentry Programs that Affect States, Localities, and Tribes

U.S. Attorneys can have a real impact on large numbers of people returning from state and local prisons. While such efforts are outside the core litigative work that a USAO does in federal court, they are well within the mainstream of the U.S. Attorney's convening power, and are clearly welcomed and encouraged by the Attorney General. Returning state and local prisoners far outnumber returning federal prisoners. In recent years well over 600,000 state and local prisoners (compared to approximately 45,000 federal offenders) have returned annually to communities across the country. U.S. Attorneys should not limit themselves solely to reentry efforts with federal offenders, as they can play a valuable role in both arenas.

### Getting Started

It is not easy to generate collaborative effort without any seed money. But it can be done. The following are suggested first steps for getting involved in support of state and local reentry initiatives. The Reentry Policy Council of the Council of State Governments Justice Center notes that getting started means getting people together and analyzing the problem. "In some jurisdictions, this may mean convening people for the first time... whereas in other jurisdictions, it may mean identifying several existing state and local reentry initiatives, determining their relationship to each other and whether they need to be restructured, and learning from research already collected." http://www.policeforum.org/library/re-entry/Re-Entry%20Policy%20Council%20Report[1].pdf According to CSG, the key steps are (1) identify someone to help in your office, preferably someone who can devote meaningful time to the project and who can draw on the office's existing relationships; (2) encourage collaboration; and (3) develop a knowledge base about the people affected by reentry and the inventory of community resources available to meet individual and communal needs and to ensure safety. Ask questions: To what degree have the right people already been brought to the table? What information and data

have already been collected? How will new reentry initiatives draw from and relate to earlier efforts?

> The U.S. Attorney's office for the Southern District of Alabama has taken a series of affirmative steps to build an effective reentry program. The attached link outlines the steps that office has taken, from assessing community assets, to building a reentry network, to sponsoring employment programs and call-in activities, to working with media and the faith-based community.
>
> SDAL: Getting Started

## Reentry Summits, Networks, and Coalitions

Reentry summits, as well as longer term reentry networks and coalitions, represent the epitome of a U.S. Attorney's "convening authority." Often no other participant is as well positioned as the U.S. Attorney to bring key reentry stakeholders together. In gathering key stakeholders together, a U.S. Attorney can draw on existing relationships with both federal and state law enforcement and the judiciary. Through Project Safe Neighborhoods and other federal/state partnerships, the U.S. Attorney has relationships with community leaders and social services organizations that can be brought to bear in helping convene key reentry partners.

Where there is a dearth of existing leadership on reentry, a U.S. Attorney's call to action can generate extraordinary levels of enthusiasm from state and federal law enforcement, community groups, social service agencies and others. Assembling key reentry

Table of Contents

stakeholders allows for a focused assessment of the state of reentry in a given jurisdiction. It provides an opportunity to develop and implement solutions to improve reentry success and lower recidivism.

As made clear by some of the examples below, successful U.S. Attorneys have started by thinking big. Yet the lack of a budget to host such gatherings is a difficult obstacle to overcome. Today's reentry networks are truly coalitions of the willing, as each participant typically must find the time and the resources on its own in order to participate. U.S. Attorneys can no longer easily pay for hotel conference rooms or provide food and beverages for meetings. Often speakers or coalition members must donate their own time, travel, and lodging. Worse, there may be fewer grants available to reentry stakeholders. Nevertheless, reentry stakeholders and community leaders resolve to meet and to work on the issues despite the lack of funds because the need to lower recidivism is itself an economic imperative.

**Northern District of Alabama:** In October 2013, the U.S. Attorney's office and the North Alabama Reentry Council sponsored a "Smart on Crime" reentry policy summit at Samford University focusing on identifying ways to lower prison population and criminal justice costs as well as reduce recidivism in Alabama. Prison overcrowding is a crisis in Alabama, and the summit gave local, state, and federal leaders a chance to discuss real ways to ease the crises. Alabama spends $550 million to operate its prison system and over 40 percent of incarcerated individuals are second time offenders. Thus, reducing recidivism presents the best opportunity to lower costs. Summit speakers included the U.S. Attorney, the Deputy Director of the Council of State Government Justice Center, several state senators, the President of Samford University, Criminology Professor Ed Latessa of the University of Cincinnati, and the Commissioner of the Alabama Department of Corrections.

Program documents:
Agenda
Justice Reinvestment Reentry Policy Summit

Press:
AL.Com

**Eastern District of Pennsylvania:** In February 2012 the U.S. Attorney's office hosted a meeting of key federal, state, and local leaders concerned about improving reentry and reducing recidivism in Philadelphia. That initial meeting grew into the Philadelphia Reentry Coalition, now comprised of over 20 organizations, including federal, state, and local law enforcement, prison, and probation officials, prosecutors, defenders, and academics. The Coalition has recently incorporated input from a variety of non-profits as well. A representative from the U.S. Attorney's office continues to serve as a member of the Steering Committee. The Coalition has assessed the unique causes and the context of recidivism in Philadelphia and outlined the key steps that need to occur among reentry stakeholders to streamline the reentry processes, improve grant eligibility, better track recidivism rates, and ultimately reduce recidivism in Philadelphia. The Coalition recently issued a countywide blueprint outlining its plans, which include forming sub-committees on education, employment, and housing, and providing technical advice on capacity building.

Program documents:
Countrywide Blueprint Oct. 2013
Philadelphia Coalition Accomplishments 6/11/13

**Eastern District of Wisconsin:** In November 2013, the U.S. Attorney's office hosted a reentry summit for over 100 participants. The USAO began the undertaking by reaching out to a variety of governmental and non-profit stakeholders to assess interest in a summit. The summit sponsors included not just the USAO, but other federal, state, and local law enforcement partners, as well as NGOs. Once the initial group was assembled, tasks such as identifying speakers and making arrangements were divided among the co-sponsors. At the summit, both federal and local reentry programs were discussed, and the U.S. Attorney and the Secretary of the Wisconsin Department of Corrections were featured speakers. Formerly incarcerated individuals as well as state and federal probation and parole offices spoke as well. The summit covered evidence-based practices and looked at the collective changes that need to occur in order to fully embed reentry practice into existing institutions.

Program documents:
Milwaukee Summit Agenda

**Western District of Virginia:** The Roanoke Area Reentry Summit in November 2013 was a free, one-

Table of Contents

day conference aimed at bringing a diverse group of service providers, law enforcement officials, and community leaders together to work cooperatively to find ways to provide a more positive transition for formerly incarcerated individuals, their families, and the community. The summit featured panel discussions focusing on major challenges facing reentering individuals such as housing, employment, financial obligations, voting rights, basic documentation, mental health, substance abuse and more. Discussions also took place on the work being done by prison officials before individuals are released that make for a smoother transition back to the community.

Program documents:
Roanoke Summit Invite
Roanoke Agenda

## Long term value of a summit

In June 2006 the Middle District of Florida USAO organized and sponsored a three-day reentry summit, the first of its kind in that district. In many ways, that summit was the launch pad for the groundbreaking, institutional reentry reforms that have taken place in the district since that time. Key state, federal, and local leaders were invited, including the Secretary of the Florida Department of Corrections, federal and state prison officials and probation officers, psychologists and counselors, employers, formally incarcerated individuals, and the heads of leading charitable, faith-based, and social service organizations. The summit also incorporated as part of its agenda a meeting of the Governor's reentry task force. The June summit was followed up in September with one-day, USAO-sponsored regional workshops in Tampa and Jacksonville, as well as a USAO-sponsored judicial luncheon. MDFL 2006 Summit Agendas

The U.S. Attorney's effort to bring together statewide leaders clearly had an impact. Over the next two years following the summit the Florida Department of Corrections, working in conjunction with other summit participants, agreed to reconfigure certain regional correctional facilities throughout the district into transitional institutions, to which prisoners would be sent toward the end of their sentence in preparation for release. During this time the USAO helped lead consistent and productive reentry networks comprised of local law enforcement, community leaders, and social service agencies in the Hillsborough County (Tampa) and Duval County (Jacksonville) areas.

The USAO has co-chaired, maintained representation on, or served in an advisory role on the local reentry networks since the beginning. MDFL Hern docs Later, local sheriffs in the Tampa and Jacksonville areas collaborated with local stakeholders to create "portals of entry" which were "one stop shop" locations where released individuals could get access to government services, transportation assistance, and a wide variety of community services and treatment providers. JREC Site

Similarly, two faith-based social service agencies, Abe Brown Ministries (ABM) and Operation New Hope (ONH), both of which had participated in the original 2006 summit, began working in tandem to meet the employment and housing needs of returning individuals. ONH focuses on training and vetting released offenders to certify them as employable. ONH's "Ready4Work" program has become a nationally recognized reentry employment program. http://bcove.me/uf3akpsk. ABM provides continual family contact and support programs, such as "virtual visits" and weekend trips, post-release housing facilities and structural transitional life-skills courses for newly released individuals.
http://youtu.be/ZpG4zhMj2tw

Table of Contents

# Notification and Call-in Programs

Many USAOs involved in state and local reentry activities participate in some form of notification or call-in program. These programs are often a part of a district's Project Safe Neighborhoods program, because they depend on relationships with state and local law enforcement. Typically the format is as follows: Law enforcement officials identify recently released state or local individuals who are at high risk of recidivism. They are notified to attend a meeting at which both law enforcement and social service agencies speak to them about what is available to help them move away from a life of crime, and what punishments await if they choose not to. The basic format for this activity was first piloted in High Point, North Carolina, and was conceptually outlined by Professor David Kennedy of the John Jay College of Criminal Justice.

**Western District of Wisconsin:** Working closely with the Madison Police Department, the USAO in the Western District of Wisconsin has helped sponsor five call-ins since November 2011. The individuals who attended the first four of these meetings were collectively responsible, prior to the call-ins, for 1,325 charged offenses, 295 felony convictions, 387 misdemeanor convictions, and 391 individual victims. Service providers met first with the participants to outline the "carrot," i.e., the services available to help keep them away from crime and become productive citizens. Next, law enforcement spoke to the group about the punishment they would face if they continued with their life of crime. Each of the call-ins is closely scripted for both service providers and law enforcement. Since the call-ins, only three of the first 40 have re-offended in any significant way. Also, in contrast to the 391 victims identified before the call-in, only six people have been victimized since the meetings. Of those who did re-offend, two were prosecuted by the state and one by the USAO, and all received sentences of over 12 years.

   Program documents:
   WDWI Call-In Program

   Press:
   Madison Police to Double Unit Focused on Repeat Violent Offenders
   WDWI Success Article

**Eastern District of Pennsylvania:** In June 2013 the USAO launched its first Project Safe Neighborhoods Call-in Program. Law enforcement speakers included the U.S. Attorney, the Philadelphia Police Commissioner, Philadelphia District Attorney and others. Several community members and formerly incarcerated individuals spoke about the tragedy that violence has played in their lives. Finally, the attendees received a full description of the various social service organizations poised to help them.

   Program documents, including scripts for participants:
   EDPA Call-in Program Documents1
   EDPA Call-in Program Documents2

**Northern District of Illinois:** The USAO coordinates bi-monthly meetings for prisoners who have been put on probation or paroled into the community from state prisons within the past six months. The Illinois Department of Corrections determines which should participate, focusing on individuals with a history of violence who are at high risk for recidivism, such as those who have committed firearms offenses, including aggravated battery with a firearm, unlawful use or possession of a firearm, and murder. The state parolees and probationers are notified to attend the meetings by the Illinois Department of Corrections or the Cook County Probation Department. Attendance is mandatory, and there are mild sanctions for those who do not show up. The USAO sets up the meetings and arranges for speakers. Meetings are held in each police district at civic locations such as schools and community centers. The meeting format follows the same general outline as described above.

   Program documents:
   Offender Notification Forums
   Offender Notification Forms

**District of Massachusetts:** The Boston Reentry Initiative (BRI) is one of the oldest in the country. The USAO plays a role in the BRI somewhat similar to that of the USAO in Chicago's Offender Notification Forums. A primary difference is that BRI targets inmates shortly after they arrive in prison, rather than after they have been released. Within 45 days of arriving at either the Suffolk County House of Corrections or the Massachusetts Department of Corrections inmates are selected for the program primarily by the Suffolk County Sheriff's Department. The list of candidates is vetted with the USAO in consultation with the District Attorney's Office. Selected prisoners have

extensive criminal backgrounds, histories of violence, and gang affiliation. They are required to attend a panel session in the prison. During the panel session, law enforcement officials, including an AUSA, address the participants. Social service providers and faith-based organizations also attend and discuss the resources they can provide both during and after incarceration. Collectively the group conveys a unified message that the inmate has the power to change. Each participant receives a Transition Accountability Plan and is assigned a mentor. The USAO is working with others to expand the BRI concept to additional counties, including Middlesex and Worcester, as well as to returning state prisoners.

There are very few costs to the USAO apart from the expenditure of USAO employee time. The AUSA assigned to the panel sessions spends approximately 12 hours each month presenting at four correctional facilities and evaluating candidates. About 12 to 15 inmates participate in each reentry panel. At the beginning of each new prisoner reentry panel program, the USAO provides a training session to offer an overview of the program, its participants and subject matter. The USAO does employ a full time Community Outreach Coordinator who spends 10 to 20 percent of her time on matters relating to the reentry initiatives, and USAO staff regularly attend task force meetings of the BRI and other prisoner reentry programs.

Studies undertaken on the BRI show that, even with its focus on the most violent inmates, it has led to an approximately 30 percent reduction in recidivism. This is so even though only 21 percent of inmates found work in the first year. The USAO has commissioned a new study, which will run until 2015, that tracks defendants who attended a reentry panel.

Program documents:
BRI Description

Press:
BRI Press

(Other Similar Call-In Programs)

Western District of Oklahoma:
WDOK Reentry Forum Press
WDOK Reentry Press Video

Eastern District of Wisconsin:
EDWI Forum

District of Maryland:
MD Call-In Program Document

# Specific Issues

## Employment

Employment is, of course, one of the keys to successful reentry. In September 2013 the Justice Center at the Council of State Governments produced an important BJA-funded report on reentry and employment. This paper outlines (1) what works to reduce recidivism, (2) proven and promising practices to improve outcomes for hard-to-employ individuals, and (3) an integrated approach to improving reentry and employment.
Sept 2013 CSG Employment Strategies

USAOs can play an important role in improving employment outcomes and lowering recidivism for formerly incarcerated individuals. Below are a variety of steps that USAOs have successfully taken to help improve employment in their districts.

**Southern District of Alabama:** This employment job fair program is the result of persistent effort on the part of the U.S. Attorney who set the goal of having a viable reentry program for federal and state prisoners returning to the Mobile area. In 2010 the U.S. Attorney reached out to the Mobile Chamber of Commerce to raise the issue of employment for returning prisoners. The USAO also found an interested partner in Doug Burris, the Chief Probation Officer in the Eastern District of Missouri, as well as a regional workforce development council and the Federal Public Defender. The overarching goals of this program are to address drug treatment, employment, and housing for returning individuals, but the program thus far has focused primarily on employment issues. The USAO organized a meeting for potential employers at the Mobile Chamber of Commerce, as which the U.S. Attorney and Doug Burris discussed the available federal bonding program, as well as a federal tax credit that may be available for employers of formerly incarcerated individuals.

Program document:
SDAL Job Fair Agenda

Press:
SDAL Employment Press1
SDAL Employment Press2

Table of Contents

Another meeting, billed as a job fair for formerly incarcerated individuals, potential employers and service providers, was held at the local community college in May 2011. *See attached agenda and press.*

Agenda and Press:
SDAL Ex Offender Job Fair Agenda-Press

**These are some of the programs that give incentives to employers to hire formally incarcerated individuals:**

- Fidelity Bonding program from the Department of Labor. Provides that an employer can receive six months of free bonding up to the amount of $5,000 per hire.
http://www.bonds4jobs.com/

- Work Opportunity Tax Credit. Provides that a business that hires individuals within one year of their release would be eligible for a $2,500 tax credit for each hire. http://www.doleta.gov/business/incentives/opptax/

- On-the-job-training (OJT). A 50 percent wage subsidy while the new hire is in training is available to employers through the Department of Labor.
http://www.mobile-works.org/pro_ojt.php

- Individual Training Account (ITA). Training scholarship funds to equip formerly incarcerated individuals for employment.
http://www.mobile-works.org/pro_its.php

Time expended by the Victim/Witness Coordinator and other staff in the office has been the primary cost to the USAO. The office does not have a full time reentry coordinator.

**Western District of Oklahoma:** The USAO provides an employment package to individuals going through its Project Safe Neighborhoods anti-violence call-in program. The package was created by reaching out to various employers in the district and obtaining basic job information that may be of use to formerly incarcerated individuals.

Program document:
WDOK Employment Brochure

**District of Columbia:** In May 2013 the USAO held an Employer Reentry Forum that brought together the key government and social service agencies involved

in employment services for returning individuals. Creating a coordinated approach to helping these individuals find employment is critical to success. This is a great example of the U.S. Attorney's convening authority.

Program document:
DC USAO Employer Reentry Program

**Middle District of Florida:** The USAO in Tampa has been fortunate to find an exceptional non-profit organization that "reaches in" to prisoners before they are released and identifies those that it can vet, train and certify for a variety of employment opportunities once they leave prison. The program is known as "Ready4Work" and is run by Operation New Hope in Tampa, Florida. This organization has been recognized by Presidents Clinton, Bush, and Obama for its innovative work, and it is interested in expanding its operations to other areas in the country.

Program document:
Operation New Hope

Media:
http://bcove.me/uf3akpsk
http://www.operationnewhope.com/news/videos/

**Northern District of Illinois:** The USAO has hosted a full-day conference for potential employers and provided employers with practical information, including how to interpret a criminal background check. It should be noted that some employers who actively hire convicted individuals avoid publicity for their programs, believing that such notice may serve to undermine their efforts.

Program documents:
NDIL Agenda-Brochures on Fed Programs and Conference Materials
NDIL Talking Points

# Reentry for Women

Female inmates have a higher rate of drug and mental health problems than men, and 70 percent of incarcerated women have children younger than 18.

**District of Columbia:** Over the past few years the USAO has sponsored two unique programs, one in

Table of Contents

2011 and one in 2013, each devoted exclusively to returning women offenders.

The USAO reached out to various local partners, including the Court Services and Offender Supervision Agency, D.C.'s local counterpart to the U.S. Office of Probation and Pretrial Services, as well as to the U.S. Parole Commission, local women's reentry centers, and the faith-based community.

For the 2011 program the USAO identified two non-profits, Our Place D.C. and Serenity, Inc., which provide job training, clothing and housing assistance as well as drug treatment and mental health counseling referrals for women returning from incarceration to the D.C. community.

Space for the forum was donated by a local church. The USAO planned this program in response to the community's negative attitudes towards reentrants, especially women. The April symposium, "Walk a Mile in Her Shoes," was designed to educate community members about the issues associated with returning women prisoners and to enable these returning women to find appropriate support.

> Program document:
> 2011 Symposium Brochure
>
> Press:
> Washington Post Article

The May 2013 symposium was built upon similar steps, including outreach to local government entities and non-profits. The program was focused on building better relationships, and included not only law enforcement speakers, but a motivational speaker as well.

> Program document:
> 2013 Symposium brochure

## Fines and Fees as a Barrier to Reentry

Upon their release from incarceration, formerly incarcerated individuals often have a difficult time paying traffic tickets or other financial obligations that accrued interest or penalties while they were incarcerated and unable to address them. For instance, a defendant's failure to pay or contest a speeding ticket incurred prior to incarceration for another offense may accrue interest and penalties while the offender is incarcerated that amount to hundreds or even thou-

sands of dollars upon the defendant's release. The issue has begun to garner press attention.

NY Times Alabama Article. Several USAOs have explored a variety of creative ways to address this issue.

### Issues and Barriers Surrounding These Debts

Outstanding financial obligations have a wide array of effects on individuals facing reentry. For instance, many jurisdictions will deny or revoke a driver's license in lieu of payment for speeding tickets while a person is incarcerated and unable to pay or appear to contest the ticket. Loss of a driver's license results in additional hurdles for people who face the already difficult task of finding employment and getting to and from court appointments. Delinquent financial obligations may also be converted into civil judgments that can count against offenders' credit scores and impede their ability to obtain a loan, mortgage or lease.

Many states will extend probation terms, or even order further incarceration, for nonpayment of these fines. Typically the cost of such further incarceration outweighs any expected revenue from the unpaid traffic fines or tickets, thus creating further financial constraints on a local jurisdiction's criminal justice system.

Penalties and interest on tickets and other fines that accrue while a person is incarcerated reduce their ability to pay child support payments, victim restitution, and other critically important obligations. Also, most individuals earn less income after their incarceration than before, making it harder to meet all their obligations.

### What Can USAOs Do?

USAOs are taking different approaches to this issue, depending on the circumstances and resources available in each district. Some districts are reaching out to local non-profits, law school clinics, or other groups. Other offices have taken certain direct steps on their own. Here are several examples:

### U.S. Attorney Direct Involvement

**Southern District of Alabama:** As part of the Project Hope reentry initiative, the U.S. Attorney has met with the local bar to encourage them to

Table of Contents

provide pro-bono services to individuals who incur augmented traffic fines due to incarceration. There are plans to develop a model/template "Motion for Appropriate Relief" that the local bar can use to ask courts for equitable relief in such circumstances. In addition, the U.S. Attorney has met directly with the clerk of the local court in his jurisdiction and with the State Administrative Office of Court to discuss the issue. Both the state agency and local court have committed to developing court software applications that will flag outstanding traffic violations at the time of arrest and correspondingly notify the court that has the outstanding traffic ticket that the defendant is incarcerated and will be unable to appear. Such action is intended to obviate the need for local courts to issue holds or warrants for the person's failure to appear. For further information contact U.S. Attorney Kenyen Brown at Kenyen.Brown@usdoj.gov.

### Reaching out to bar associations, law schools, and pro bona legal services

**Eastern District of Pennsylvania:** As part of its participation in the Supervision To Aid Reentry (S.T.A.R.) Federal Reentry Court, the USAO has partnered with the Philadelphia Bar Association's Volunteers for Indigent Program to encourage its members to provide former offenders with free legal assistance for issues relating to credit repair, traffic court, license restoration, child custody, and business development. In addition, attorneys from the Young Lawyers Division have volunteered to help several reentry court participants with legal issues ranging from estate disputes to music copyright law. The Federal Reentry Court also partners with Temple University School of Law and Villanova Law School, which allows law students, supervised and mentored by attorneys from two local law firms, to represent individuals in Philadelphia's Traffic Court. For further information contact Cyndi Zuidema at Cynthia. Zuidema@usdoj.gov.

**Western District of New York:** As part of its participation in the federal reentry court, The USAO endeavors to connect reentry court participants with free legal services to help them address their fines and fees. For instance, following the implementation of the federal reentry court in Buffalo, the Legal Aid Bureau of Buffalo has begun to take federal clients, in addition to state clients. The Legal Aid attorneys volunteer their time to help formerly incarcerated

individuals and accompany them to local magistrate courts, family court and the Department of Motor Vehicles. This group has streamlined the procedure for people to obtain temporary driver's licenses and has also successfully had outstanding vehicular fines either reduced or completely forgiven. For further information, please contact AUSA Ned White at Edward.H.White@usdoj.gov.

**District of New Jersey:** The USAO participates in a reentry court which works closely with the Newark Reentry Legal Services, known as "ReLeSe." ReLeSe provides free legal services to participants in the Reentry Court. These services include help with suspended driver's licenses, fees associated with moving violations and municipal court issues. ReLeSe can also refer individuals facing other legal issues (such as family court matters, divorce and landlord/tenant disputes) to volunteers who are experts in that area or to lawyers at its parent organization, Volunteer Lawyers for Justice. The Reentry Court strongly encourages its participants to seek the help of ReLeSe with any legal matter or prior to appearing in any court outside the federal system. More details on the ReLeSe program can be found at http://www.vljnj.org/index. php?page=programs-relese. Similarly, the USAO in the District of New Jersey also works with the Federal Prisoner Reentry Pro Bono Project ("the Project"). This program is run by the Rutgers School of Law-Camden in conjunction with the United States District Court for the District of New Jersey. AUSAs have trained law students in the Project to navigate different aspects of the federal system, including tutorials on the United States Office of Probation. In return, the Project has worked closely with the probation office to identify potential clients with civil legal issues that prevent their successful integration into society. For more information on the Federal Prisoner Reentry Pro Bono Project, please visit http://camlaw.rutgers.edu/ federal-prisoner-reentry-pro-bono-project.

For more information on what the District of New Jersey is doing, please contact Mikie Sherrill at mikie. sherrill@usdoj.gov.

### Executive Reentry Council Action

**Northern District of Alabama:** The USAO has organized an Executive Committee for the North Alabama Reentry Council. The Executive Committee is comprised of federal and state executive policy

makers and stakeholders in the criminal justice system; it provides direction and goals for the larger Reentry Council, made up of over 200 community based service providers. The Executive Committee helped convene a group of interested municipal court judges and others who deal with the fines and fees issue every day. The judges have agreed to take affirmative steps within their own jurisdictions to identify ways to maintain the public's fiscal interests and public safety, while also providing appropriate flexibility for formerly incarcerated individuals to meet or discharge their obligations. The Executive Committee has also provided information to state and local leaders on best practices used in other jurisdictions related to the use of fines and fees. For further information contact Jeremy Sherer at Jeremy.Sherer@usdoj.gov.

### Other Programs

**District of Kansas:** Formerly incarcerated individuals participating in the federal reentry court in the District of Kansas can take advantage of a unique program established by U.S. Probation that assists and expedites the process by which these individuals may obtain their drivers' licenses and create payment plans for any preexisting legal fines and fees. Through this program, Probation will receive a report from the Kansas Department of Revenue that details any preexisting fines and fees that preclude the person from obtaining a license, and the steps needed to repay the fines. Probation also helps individuals obtain a temporary hardship license, which provides them with twelve months of licensed driving while they make good faith payments on their preexisting fines and fees. For further information contact AUSA Mona Furst at: Mona.Furst@usdoj.gov.

### Further Information and Resources

The Council of State Governments Justice Center website has collected numerous outstanding resources on this issue, including a variety of practical "How To" collections as well as several academic analyses of the issue. CSG Summary

Civil legal assistance can play a critical role in reducing recidivism and increasing chances for successful reintegration into the community for people leaving jail and returning to society. Securing an occupational license or an expungement for an eligible individual may make the difference in that person's ability to

get a job. Preventing an illegal eviction may prevent homelessness and keep a family together. Legal aid and pro bono organizations can help address these and other barriers that keep people with criminal records from successful long-term reintegration. DOJ Legal Aid Summary

The Justice Center surveyed members of the National Association for Court Management, an organization of court managers from all types and levels of courts, about financial obligations assessed on criminal defendants. The survey results showed that 65 percent of the responding courts incarcerate defendants for failure to pay financial obligations, and 66 percent of responding courts do not coordinate with their jurisdiction's child support agencies when seeking to collect fines or other financial obligations. NACM Survey Summary.

The Justice Center has also compiled a partial list of federal agency initiatives on this issue, which can be found here: "Repaying Debts – Agency Initiatives."

Attached here is a list summarizing the types of legal assistance needed to remove barriers to successful reentry: Description of Legal Services.

Press:
ABA Journal Article

## Reentry in Indian Country

There are serious public safety challenges in reservation communities in the United States. At midyear 2009, tribal, federal, and state authorities incarcerated American Indian or Alaska Native individuals at a rate 25 percent higher than the overall national incarceration rate. Due to federal criminal jurisdiction on many reservations, juveniles detained in federal facilities are predominantly American Indian males, generally between 17 to 20 years of age, with an extensive history of drug and alcohol abuse and violent behavior and who have often been sentenced for sex-related offenses.

The public safety challenges faced by reservation communities are exacerbated by the unique situations faced by American Indians returning home after serving federal prison sentences for crimes of violence. Indian country unemployment rates average 49 percent, even in better economic times. High

unemployment compounded with a lack of affordable and adequate housing magnifies challenges for returning individuals. Further, halfway houses are rarely located on reservations, for cultural as well as economic reasons. So American Indian offenders may spend their final months of incarceration in a halfway house located a great distance from the reservation communities to which they will eventually return. In addition, their home communities are far from the health and employment services they need for successful reentry.

Against the backdrop of these daunting challenges it is not surprising that there are currently no federal reentry courts directed specifically to the needs of Native Americans. Because current data systems do not fully track Native Americans in the federal criminal justice system, efforts to help them are impeded by a lack of knowledge about when, where, and how many Native Americans will return to any given reservation. Moreover, reservation populations range greatly in size, and many are small, rural communities far from any federal court facility. Indeed, the Bureau of Prisons (BOP) currently operates no Residential Reentry Centers (RRCs) (halfway houses) on or near Indian Country lands. These and other impediments make providing relevant reentry services at the right time, in the right place, for the right people very difficult. Yet it is these same reservation communities that have the greatest need for lower recidivism that appropriate reentry services might bring about.

**What Can USAOs Do?**

A number of affirmative steps have been taken in districts around the country which could be replicated in other districts under the right circumstances. These include the following:

**Local Efforts to Identify Returning Native Americans Offenders:** Although current BOP or U.S. Probation Office data systems are insufficient to fully identify American Indians who are returning to specific reservation communities, local efforts to gather such information may help. For instance, in the District of North Dakota, the USAO has identified the BOP's RRCs in Fargo and Bismarck as a "choke point" in the system where re-entering American Indians can be contacted, intervened with and referred to service providers available on the home reservation.

**Federal /Tribal Diversion Program:** The District of South Dakota has developed a joint federal/tribal diversion program designed specifically for juveniles in Indian Country. Under the program the juvenile's case is referred to a tribal court where the juvenile is adjudicated delinquent, but supervision is then provided by U.S. Probation Office. A memorandum signed by the juvenile and both tribal and federal prosecutors, as well as the tribal judge is entered on the record in federal court. The intent of the program is to avoid a federal conviction for juveniles while also providing the more robust federal resources for the juvenile's supervision.

Program documents:
South Dakota Federal/Tribal Diversion Program

**Other Activity:**

**FIRC Tribal Reentry Subcommittee:** The Federal Interagency Reentry Council (FIRC) Tribal Reentry Subcommittee is comprised of Justice and Interior Department experts on the public safety challenges faced by these communities. The FIRC is collecting better data on Native Americans in the federal criminal justice system and enhancing coordination among the many stakeholders participating in the Federal/Tribal criminal justice systems. The Attorney General's Advisory Committee (AGAC) Native American Issue Subcommittee is an active participant in the FIRC. FIRC Snapshot

**Resources:**

DOJ Indian Country Reentry Communications Tool: The BOP has paired a list of key BOP reentry and USAO personnel Indian Country in a document that also identifies BOP Native American programming as well as the size of the Native American inmate population in each BOP institution as of December 2012. DOJ IC Reentry Communications Tool

**Strategies for Creating Reentry Programs in Indian Country:**

This document recommends ways to support the development of tribal reentry programs. The examples are state and tribal court-based programs formerly funded by the Weed and Seed program. http://www.aidainc.net/Publications/Full_Prisoner_Reentry.pdf.

Table of Contents

**Integrating Tribal Cultural Practices into Reentry Plans:**

This overview document describes a variety of traditional tribal cultural practices that may be incorporated into a full reentry program.
Integrating Tribal Cultural Practices

National Reentry Resource Center – Tribal Affairs:
http://csgjusticecenter.org/reentry/issue-areas/tribal-affairs/

Press:
More Inmates in Indian Country Jails: The Crime Report – Inmates in Indian Country Jails

# Bureau of Prisons

USAOs seeking to initiate a reentry program or event should consider reaching out to the BOP Reentry Affairs Coordinator (RAC) in their district. The BOP has designated one RAC for each BOP correctional facility in the country.

BOP List of Reentry Coordinators Duties for BOP RACs specifically include partnering with reentry councils, taskforces, and other coalitions for the purpose of improving inmate reentry.

They are expected to engage with reentry courts where appropriate and can participate in job fairs, training events, and other initiatives on behalf of the BOP.
BOP Reentry Coordinators' Duties

An inmate is typically sent to a Residential Reentry Center (RRC) in preparation for release, including meeting with a U.S. Probation Officer in advance of his going on to supervised release. For more on RRCs, see this link. http://www.bop.gov/locations/cc/index.jsp.

Here is a link to BOP national programs that can improve an inmate's successful reentry into society upon release: BOP National Programs

Table of Contents

# IV. Federal Reentry Initiatives in U.S. District Courts

Reentry courts are one of a variety of initiatives that Federal District Courts use to reduce recidivism.[1] Each district court determines on its own whether and how to engage in a reentry court program. The Administrative Office of the U.S. Courts, the Chair of the Judicial Conference Criminal Law Committee, the Chair of the U.S. Sentencing Commission, the Federal Judicial Center, and the U.S. Office of Probation and Pretrial Services have all expressed approval for reentry courts. For a current list of reentry and drug court programs, including brief program descriptions and contact information, see the attached chart, compiled by the Administrative Office of the U.S. Courts.
Reentry Court List July 2013

## General Reentry Court Operating Principles

The Federal Judicial Center (FJC) states that post-conviction federal reentry courts "employ the authority of the court to impose graduated sanctions and positive reinforcements in a team approach, typically involving a judge, probation officer, Assistant U.S. Attorney, Assistant Federal Defender, and contract service provider. The team marshals the resources necessary to support the offender's integration, sobriety, and positive law-abiding behavior. Within this general model, considerable variations exist in terms of the structure, focus, and approach of the federal court programs." Although there is no specific mandate or guidance from the Administrative Office of the U.S. Courts,

virtually all federal reentry courts incorporate "evidence-based practices" and "promising practices."

### Evidence-Based Practice in Reentry
Evidence-Based Practice and Principles of Effective Supervision



*Sanford Coats, U.S. Attorney in the Western District of Oklahoma, talks to participants in the district's Probation and Parole Reentry Program*

Evidence-based practice is the conscientious use of the best evidence available to inform decisions about the supervision of individuals as well as the design and delivery of policies and practices to achieve the maximum, measurable reduction in recidivism. Evidence-based practices are programs scientifically proven to be effective. The term implies that (1) there is a definable outcome, (2) the outcome is measurable, and (3) the outcome is defined according to practical realities. The term "promising practices" refers to innovations based on evidence-based practices that have not yet been shown through research to be effective. Like evidence-based practices, promising practices pay attention to outcome, evidence, and measurable standards. The organizing principle for the federal judiciary's implementation of evidence-based practice is the Department of Justice National Institute of Corrections Integrated Model for Implementing Effective Correctional Management of Offenders in the Community.
NIC Integrated Model

---

1.　　Reentry courts represent the most formalized and staff intensive of the various initiatives. Other reentry initiatives include the use of actuarial risk/needs assessment instruments at the start of the term of supervised release, the use of cognitive behavioral treatment programs with moderate-to-high risk/need offenders, and the use of Defendant/Offender Workforce Development (DOWD) programs. If the judiciary does not support a full blown reentry court, the USAO may want to encourage the court to nevertheless take some of the smaller steps listed above to help reduce recidivism.

Table of Contents

# Post-Incarceration - Reentry Court Operations

A federal reentry court typically serves a limited number of individuals, perhaps five to 20, at any one time. These individuals have served their time and are about to begin, or have just begun, a period of supervised release. They are selected for participation in the program primarily by the U.S. Probation Office, with input from the USAO, the federal defender, and the courts. They are at medium or high risk of re-offending, rather than likely to succeed. Most programs are voluntary, with the offender signing a contract agreeing to participate.

Reentry courts are directed at a variety of types of individuals. An FJC assessment found that of the 38 reentry courts it surveyed, 23 were directed at federal prisoners who had some form of documented substance abuse, 12 were directed at high risk individuals of various types, and three were for specialized populations, including gang members and those with mental health problems.

In most reentry courts all participants together attend periodic hearings at which each participant will individually address the court about his or her own progress. In a smaller number of programs the "court" sessions take place in a conference room or other informal setting. To improve the efficiency and effectiveness of the hearing, team members, including the judge, the probation officer, the assigned AUSA, and the assistant federal defender will meet in advance of the hearing to discuss the progress of each participant.

The AUSA assigned to the reentry court is the team member who assesses and supports the individual. Depending on the program, the AUSA may make presentations to the court about each individual, and will participate in pre-hearing meetings. There may be carry-over benefits to the AUSA and the USAO arising from the continued direct contact with the reentry court participants. The role of the prosecutor in supporting a variety of evidence-based practices is discussed in the NIC publication *Using Research to Promote Public Safety: A Prosecutor's Primer on Evidence-based Practice (2008).*
NIC Primer

Generally, reentry courts require a person to participate successfully for one year, and grant graduates a one-year reduction of their supervised release. Graduates are required to be sober, law abiding, and employed. The FJC assessment found that graduation rates varied from 24 percent to 69 percent, with a median of 48 percent. For a discussion of the growth of reentry courts, and look at the various methods of evaluating their success, see the attached article in the April 2011 edition of USABulletin.
Valuing and Evaluating Reentry

### Starting A Reentry Court: Recommended First Steps

**First**, engage the judges and the probation officers in your district. Typically the chief judge must agree to the creation of the reentry court, regardless of who first proposes the idea. Create a working group from those within the probation office and the judiciary who want to be involved. Finding the right people is critical.

**Second**, the working group should examine the risk level of the district's population to determine whether the creation of a reentry court makes sense. If the district has a substantial moderate-to-high risk population, then a reentry court may be appropriate. However, if the district does not have such a population, the working group may wish to consider developing and implementing other, more proportionate evidence-based and promising practices.

**Third**, observe other reentry courts in action and review their documentation. The FJC found that 90 percent of court teams participating in reentry courts had first traveled to observe active reentry courts in other jurisdictions. After seeing the process in action people tend to worry less about such issues as participant self-incrimination and the role of AUSA and the Federal Public Defender (FPD).

**Fourth,** identify the crime or supervision problem that most affects your district and would most benefit from this process. To the extent possible direct the focus of the reentry court to that issue. As noted above, reentry courts vary greatly in the type of offenders they support, based on the greatest need of the community. A general rule is to avoid individuals with a low risk of recidivism: research shows that reentry courts are least effective with these populations (and can even be harmful).

Table of Contents

**Fifth,** be open to change if something seems not to be working. Start small. A group of eight or 10 participants at the beginning may be all that probation and court officials are willing or able to handle. Building up to 25 or so may be possible, but you may also find that a smaller number is better, as it gives Probation Officers more time outside of court and shortens the hearings.

Once the program is up and running, ensure that it gets regularly evaluated and assessed. Be prepared to make changes.

Attached is a proposal drafted by the Eastern District of Pennsylvania USAO when it first sought to initiate a reentry court: EDPA Proposal on Starting a Reentry Court

### Reentry Courts

The following are brief descriptions of a variety of federal reentry court programs. Where available, links to program documents, press clippings, studies of program effectiveness and related documents are included with the description.

## Programs for Substance Abusers

**District of Massachusetts:** The Court Assisted Recovery Effort (CARE) program focuses on defendants with an identified drug addiction who are at high risk to commit additional crimes based on that addiction. Started in 2006, the program is considered highly successful.

> Program documents:
> CARE
>
> Press:
> CARE Press In June 2009 the Attorney General spoke, via video, at one of the CARE graduation ceremonies. Press on the AG's remarks, as well as other press is included.

### Effectiveness Research:

**CARE 2009** CARE 2009

The CARE program has been thoroughly evaluated, and a formal study of its effectiveness was completed in 2009. The study found that 43 percent of individu-als who participated in the CARE reentry court were rearrested, while 63 percent of the control group were rearrested following regular supervision.

**District of Oregon:** This program, begun in 2005 for those with a documented substance abuse problem, was one of the first in the country, and was initiated in response to the severe methamphetamine problem in Oregon at that time. Unlike many other reentry courts, this program does not rely on pre-meeting discussions prior to the court hearing, but allows the judge and the team members to evaluate participants for the first time at the hearing.

> Program documents:
> Interagency Agreement
>
> Program assessment:
> USAO OR Reentry Court Assessment

**Central District of California:** The Substance Abuse Treatment and Reentry (STAR) program in the Central District of California was initiated in 2010 and graduated its first class in January 2011. Selected participants have a documented substance abuse problem, as identified in part by the Texas Christian University drug screening protocol. Participants have committed a range of crimes, including violent crimes such as bank robbery. AUSAs in this program take turns with other team members making presentations to the court about each participant.

> Program documents:
> STAR Outline
>
> Press:
> LA Daily Journal Article

**Western District of Pennsylvania:** The Reentry Into Society Effort (RISE) reentry program in Western Pennsylvania is a 52 week voluntary reentry court program specifically designed for federal prisoners with a documented history of substance abuse who, upon release, will reside in western Pennsylvania. The program follows the same basic pattern of other successful reentry courts, in that a team comprised of the court, a Probation officer, an AUSA, a federal defender, and a substance abuse treatment professional, assesses each participant. The participant must meet the program requirements in order to graduate, which would result in a one year reduction on the term of supervised release. Monthly court

Table of Contents

appearances assure that the court is actively aware of and involved in each participant's progress.

Program documents:
RISE Program

## Programs for Those with a High Risk of Recidivism

**Eastern District of Pennsylvania (EDPA):** The EDPA Supervision to Aid Reentry (STAR) reentry court was first proposed by the USAO, became operational in 2007, and focuses on those who have committed a variety of offenses, including some violent ones, and who are at relatively high risk to commit new crimes upon release. It serves people who live in Philadelphia and score between five and seven on the Probation Office's nine-point risk prediction index (nine is the riskiest).

Program Documents:
EDPA STAR

### Effectiveness Research

The EDPA program has become one of the most well evaluated programs in the country. The most recent study, completed in September 2013, compared the first 120 STAR program participants to 120 similarly situated individuals who did not participant in STAR. The results showed that STAR program participants were associated with an 84 percent reduction in supervision revocation, and that 61 percent of STAR participants were employed compared to only 44 percent of the control group.

2013 STAR Evaluation
2013 Annual Report

See also earlier studies:
STAR Evaluation
EDPA May 2010 Study Assessment

**Northern District of Ohio (NDOH):** The Successful Transitions-Accelerated Reentry (STAR) program, begun in June 2010, targets offenders who are more than 60 percent likely to commit new crimes. Unlike most programs, three judges preside over this court -- one district court judge and two magistrate judges. This procedure allows the judges

to caucus to reach appropriate results, and ensures that the hearings will take place on time even if one judge cannot be present

Program documents:
NDOH STAR

## Program Targeting Gang Membership

**Eastern District of Missouri:** The Probation Office in St. Louis has initiated a reentry program targeting gang members, the Gang Reentry Initiative Project (GRIP). Gang members present the greatest challenges possible to successful reentry. The program follows the basic reentry court model described above, in that a team comprised of the Court, a Probation Officer, an AUSA, a Federal Public Defender, and treatment and community partners review and assess each participant's progress through the program. Upon successful completion of the program the participant may obtain a shortened supervised release term. Given the extraordinary difficulties associated with separating from a gang, however, the program also measures success in other ways. For instance, participants who do not complete the program may nevertheless refrain from committing an expected number or type of new crimes. Anecdotal indications of this type of success can be extremely valuable to the community, despite the fact that the participant may not have formally graduated from the program.

Program description:
GRIP Summary
Project GRIP

## Program for those with Mental Health Issues

**District of Utah:** The Reentry Independence through Sustainable Efforts (RISE) program, targets people with a variety of mental health issues. Selected offenders must have an "Axis I" diagnosis, such as schizophrenia or bipolar disorder and may also be substance abusers, but all participants are screened to ensure that they are stable enough to take advantage of outpatient treatment programs. Participant selections are made by the reentry court team consisting of a treatment provider, the mag-

Table of Contents

istrate judge, an AUSA, a federal public defender, and a probation officer.

Program documents:
UT Mental Health Proposal
UT Mental Health Program

## Program Targeting Veterans' Issues

**Eastern District of Missouri:** In its Cape Girardeau office, the USAO operates a veteran's treatment court for those entering supervised release who are U.S. military veterans. The reentry court follows the basic model described above. Selected individuals are invited to participate based on their status as a veteran and other factors. The program lasts approximately one year, with the possibility of a shortened term of supervised release upon successful graduation. A team comprised of the Court, the Probation Office, an AUSA, a FPD, and a representative from the Veteran's Administration assesses the participant's progress throughout the program. Given the particularized issues and benefits that may apply when the individual is a veteran, each participant also has a veteran mentor.

Program documents:
EDMO Veteran's Court

# Diversion-Based Court Programs

More and more USAOs have begun to initiate, along with the judiciary, creative pre-sentence, diversion-based drug court or specialty court programs. Unlike traditional diversion, the programs described below do not uniformly rest upon avoidance of a federal conviction. Some of these programs result in a full dismissal of charges, while others have as their goal a sentence of probation or little to no incarceration. Also, unlike traditional diversion, courts are primary actors in these programs, and courts must participate in their creation. Some examples of these programs include the following.

## Substance Abuse (Drug Court)

**Central District of Illinois:** The USAO, the Court, the Probation Office, and the defense bar operate the Pretrial Alternatives to Detention Initiative (PADI), a ground breaking docket that for years was the first of its kind. The program is designed for the defendant whose criminal conduct is motivated by substance abuse. The USAO refers a potential candidate to the Probation Office which in turn consults with a substance abuse provider, and together they evaluate the candidate to ensure that he or she has a legitimate substance abuse problem. Once a defendant is selected for the program, he enters a period of personalized supervision by the Probation Office that is overseen by the court and members of the team, including the USAO, the Federal Public Defender and U.S. Probation/Pretrial. Upon successful completion of supervision, the defendant may expect one of a number of results that range from dismissal of the charges to a non-custodial sentence.

Since its inception, 73 of 79 participants have successfully graduated from the PADI program. It is estimated that over $6 million has been saved as a result of the lower cost of supervision of PADI graduates compared to what it would have cost to incarcerate those same graduates.

Program documents:
2013 PADI Program Summary
PADI docs
PADI Proposal

Press:
PADI Press

**District of South Carolina:** The BRIDGES program is a cooperative effort among the Court, the USAO, and the Federal Public Defender to rehabilitate substance abusers. Participants may enter the program prior to being charged or upon entering supervised release after incarceration. Supervision has three phases, early recovery, primary treatment, and relapse prevention. The entire program lasts approximately one year. Individuals who enter the program prior to being charged and successfully complete supervision can expect any of several positive outcomes from a recommendation for downward departure, to obtaining a lesser charge, to a complete dismissal of all charges, at the USAO's discretion.

Table of Contents

Successful post-incarceration graduates can expect a reduction in supervised release.

Program documents:
BRIDGES Program docs

**Central District of California:** The USAO, the court, the Federal Public Defender, and the Pretrial Services Agency (PSA) have together created a two-track specialty court/post-plea diversion program, known as Conviction and Sentence Alternatives (CASA). Selection for the program is made by the program team, comprised of the USAO, the Federal Public Defender, PSA, and the court. Track one is for candidates with minimal criminal histories whose criminal conduct appears to be an aberration that could appropriately be addressed by supervision, restitution, and community service. Examples include those charged with relatively minor felonies, including credit card or benefit fraud, mail theft, and narcotics offenses. Track two is for those defendants with more serious criminal histories whose conduct appears motivated by substance abuse. Supervision in these cases includes intensive drug treatment. Examples of eligible defendants are those charged with non-violent bank robberies, or mail and credit card theft designed to support a drug habit.

Once participation in the program is agreed upon, the defendants enter a plea under Rule 11(c)(1)(C) before a judge specifically assigned to the CASA program. For both track one and track two defendants, the court holds regular post-plea hearings in open court to assess the defendants' progress on supervision. These court hearings are focal points for the ongoing supervision undertaken by PSA and are supported by the program team, including the USAO. Successful completion of supervision in track one results in a dismissal of the charge, while successful completion of supervision in track two results in a sentence of no incarceration.

Program documents:
CASA Program overview
CASA Program documents

**Western District of Washington:** In 2012 the district initiated the Drug Reentry Alternative Model (DREAM) court, which also utilizes a plea agreement under Rule 11(c)(1)(C). In this program the participant agrees up front to plead guilty, but knows that upon successful completion of the program the case will be dismissed

with prejudice by the USAO. Participants are chosen for the program by the executive review team, which is comprised of the court and a representative from the USAO, the FPD, and U.S. Probation/Pretrial. The individual's conduct must appear to be motivated by substance abuse, the charges must not include a serious violent offense or a weapon or sexual offense, and he or she must not have a significant criminal history. The participant must sign the program agreement.

Program documents:
DREAM Program docs

**Other Drug Court Programs:** The USAO's role in drug or specialty court programs can vary as well. For instance, the Pretrial Opportunity Program ("POP") in the Eastern District of New York and the "Support Court" program in the District of Connecticut are supported by the USAOs there, although the USAOs do not typically participate in the defendants' supervision.

Program documents:
CT Support Court doc
EDNY POP Program docs

Attached here is an EDNY District Court opinion that describes not only the POP program at length, but also provides a full discussion of the need for and concept behind federal drug court programs generally. U.S. v. Leitch, et al

## Alien Smuggling

**Southern District of California:** The USAO, along with the court, the defense bar, and Pretrial Services have created a program designed to address the high volume of alien smuggling unique to the Southwest border. Defendants who smuggle aliens in an unsafe manner, or who bring in large numbers of aliens, are prosecuted through traditional means. The diversion/specialty court program is designed for young adult U.S. citizens who are paid small amounts of cash to transport illegal aliens. Defendants meeting the criteria who, after talking with defense counsel, agree to enter the program, enter a guilty plea to alien smuggling before a specially assigned judge. The defendant then agrees to a 12 month period of supervision punctuated by periodic court hearings at which the defendant's progress is assessed. If supervision is successfully completed the defendant is allowed to withdraw

Table of Contents

the plea, and the charge is dismissed. During the diversion period the court, PSA, the defense, and the USAO collectively evaluate and address the factors that led the defendant into alien smuggling. Assistance is provided with education; drug/alcohol treatment and counseling; anger management classes; and employment counseling/training.

Program documents:
Alien Smuggling Program docs

Press:
Feds Give Some Human Smugglers Second Chance

Federal Program Helps Divert Smugglers from Criminal Life

## Veterans Court

**Western District of Virginia:** The USAO partnered with nearby Salem Veteran's Administration Medical Center, the Federal Public Defender, the Probation Office, and the court to create the Veterans Treatment Court for veterans struggling with significant substance abuse and mental health issues who are charged with misdemeanors. After an initial referral by the court, and upon the agreement of the U.S. Attorney, the veteran will either be placed in pre-trial diversion to undergo the program, or will plead guilty and be placed in the program pending sentencing or as a condition of the imposed sentence. Veterans appear monthly before the court and their progress is assessed by all team members. Because the program deals with misdemeanors, supervision is shorter, typically running three to six months. A contact person from the Salem VA Medical Center helps to ensure that participants receive treatment from the VA.

Program documents:
WDVA Veterans Court Program docs

**Western District of New York:** The USAO, the U.S. Probation Office and the federal court have agreed to refer eligible veterans in the federal system to the well-established Buffalo Veterans Treatment Court, operated out of the Buffalo City Court. Under this innovative plan, eligible individuals agree that as a condition of their federal pre-trial diversion agreement they will participate in and successfully complete Buffalo Veterans Treatment Court. Thus, rather than reinvent-

ing the wheel, this program takes full advantage of the existing resources of the City of Buffalo.

Program documents:
WDNY Veterans Referral program

## Indian Country

**District of South Dakota:** This district participates in a joint Federal/Tribal Pretrial Diversion program in that is designed specifically for juveniles in Indian Country. Please see a description of this program above, under Reentry in Indian Country.

Table of Contents

# V.   The USAO Role in Reentry Grant Opportunities for State and Local Partners

State and local governments are under severe financial pressures, but limited grant funding for reentry activities may still be available. USAOs have an appropriate and important role to play in bringing open grant solicitations for reentry activities to the attention of state and local entities that may want to apply, and in connecting interested applicants with technical grant assistance at the Office of Justice Programs (OJP). USAOs regularly receive information on open grant solicitations at OJP: OJP Grants. In addition, the National Reentry Resource Center website offers a variety of email updates, to which USAOs may want to subscribe, that describe new funding opportunities for reentry: National Reentry Resource Center Funding

When grant applications reach the peer review process at OJP, USAOs will be electronically notified of the applicants in their districts that have applied for funding. USAOs have an opportunity at that stage to provide factual input to OJP, such as how long the

USAO may have worked with the grant applicant and in what capacity, what services the grant applicant provides, the applicant's history or management of prior grant projects, whether the applicant is or has been under any criminal investigation or subject to civil complaints, and the applicant's relationship with the USAO. However, USAOs are prohibited by federal regulation from endorsing any product, service, or enterprise, and any such comments on grant applicants must not be, or be perceived as, an endorsement of an applicant. See the specific guidance on these procedures in the attached memorandum: http://usanetsp.usa.doj.gov/staffs/otd/Documents/ USAO.grant.input.pdf

While grant funding, if available, is of course helpful, current experience as detailed above shows that many local jurisdictions are interested in coordinating with USAOs on the basis of mutually donated time and effort.



*The National Criminal Justice Initiatives map highlights national reentry and other criminal justice initiatives implemented throughout the United States and its territories. The map will be updated periodically as new initiatives are announced:*

http://www.nationalreentryresourcecenter.org/national-criminal-justice-initiatives-map

Table of Contents

# VI. USAO Reentry Staffing Considerations

As part of the Smart on Crime Initiative, each USAO must designate a "Prevention and Reentry Coordinator." As noted above, this position is a collateral duty that may be filled by an AUSA or a support staff person. Identifying the right person is critical to success. Moreover, devoting already over-stretched staff to what may be a new area of work, over and above existing litigation and outreach efforts, can be a challenge, particularly in small offices. The following are a variety of staffing considerations and options.

**Assigning AUSAs to reentry court:** USAOs most often assign one AUSA, with a backup, to handle reentry court duties and to ensure program continuity. The AUSA may typically spend two hours a week on reentry court activities, including both a pre-hearing meeting and the hearing itself. In a number of districts USAO management has successfully canvassed the office to ask AUSAs to volunteer for reentry court duty. Identifying AUSAs who are interested in reentry court work and assigning those who will put effort and enthusiasm into the work are key to a successful undertaking. It is possible that participating in reentry court may save overall AUSA time by lowering the time spent on regular revocation hearings. Studies in the EDPA show that reentry court participants recidivate at a rate of 15 percent, while control group offenders recidivate at over 47 percent.

**Advertise for non-compensated SAUSAs:** You may advertise for non-compensated Special Assistant U.S. Attorneys to do reentry work. This is an excellent opportunity for less experienced lawyers to work at a USAO and obtain experience. See the attached guidance on the advertisement for and use of non-compensated SAUSAs.
http://usanet.usa.doj.gov/memos/memorandum.cfm?Memo_ID=5237

**Contractors:** Several districts contract with a lawyer to work as a part-time reentry coordinator. The coordinator can reach out to potential resources (bar associations, community colleges, workforce development organizations, mentoring organizations)

and can work with individual reentry court clients on issues such as finding housing, resolving student loan debt, and finding pro bono counsel for civil legal issues. Please note, while it is permissible to hire a lawyer to do this work, the lawyer cannot "practice law" for the USAO.

**LECs and Outreach Specialists:** Organizational and outreach work in support of state and local reentry efforts can be undertaken by any number of USAO employees. In many districts the Law Enforcement Coordinator works on reentry issues, while in a few districts an outreach specialist can also perform this work.

Table of Contents

# VII.   Additional Resources, Training, and Other Materials

## Reentry Courts

### OLE Online Videos

EOUSA's Office of Legal Education has produced two training videos about reentry courts. One video is a moderated panel discussion, with a U.S. Magistrate Judge, a U.S. Probation Officer, a First Assistant U.S. Attorney, and an Assistant Federal Defender discussing how best to engage the judiciary to initiate a reentry court system. This video also discusses a variety of programmatic issues that occur when those court officers participate in reentry courts, including the role of the AUSA, program assessment, and resources. Facilitating Offender Reentry to Reduce Recidivism-Federal Reentry Courts: Practical First Steps for USAOs: mms://10.4.203.133/vod/DOJ4321.300kbit.wmv

The NAC also has a moderated panel discussion with representatives from the U.S. Office of Probation and Pretrial Services regarding the concept of evidence-based practices and the five core principles for effective intervention. This video is designed to help prosecutors understand the concepts and practices used by Probation and Pretrial Service Officers. Facilitating Offender Reentry to Reduce Recidivism-Introduction to Evidence-Based Practices and Effective Intervention: mms://10.4.203.133/vod/DOJ4320.300kbit.wmv

**Ongoing Federal Studies:** The Federal Judicial Center is undertaking a three-year pilot study, to be completed in 2014, with five new reentry courts in order to evaluate, among other things, the role of the judge in reentry courts. This study may produce a model of what works best for federal reentry courts. The FJC is also producing a descriptive assessment of more mature reentry court systems. http://usanetsp.usa.doj.gov/staffs/otd/Documents/FJC_study_design.docx

**Related State Court Research on Reentry Courts:** The Council of State Governments has compiled an assessment of the role of the courts in reentry, based on the work of a multi-stakeholder focus group. http://usanetsp.usa.doj.gov/staffs/otd/Documents/CSG_2011_oval.pdf

**The National Association of Drug Court Professionals** provides information and support to state reentry courts, which are more commonly known in the state systems as "drug courts." The website provides a fact sheet summarizing the research on state reentry court effectiveness: http://www.nadcp.org/learn/drug-courts-work. The website also maintains a map of state drug courts with contact information for officials in each state: http://www.nadcp.org/learn/find-drug-court

**Reentry Court Solutions:** This website contains information on state reentry courts, including articles, research, and interviews with reentry court participants: http://www.reentrycourtsolutions.com/

## The National Reentry Resource Center Website

The National Reentry Resource Center offers a wealth of current, evidence-based reentry information; individualized technical assistance for Second Chance Act grantees; and training to support grantees and advance the field. The Resource Center hosts an online library with over 1,000 publications, reports, and other reentry materials. A primary and critical resource, this website also offers a variety of email updates, to which USAOs may subscribe, that describe new training, publications, conferences, and other reentry resources and funding opportunities. http://csgjusticecenter.org/nrrc/

**Reentry Funding Opportunities (DOJ)** http://ojpnet.ojp.doj.gov/info/resources/Grants/SiteAssets/eLearningResources/EOUSAWebcast/player.html.

Table of Contents

**Second Chance Act Funding:** BJA and OJJDP make awards to state and local government agencies, tribes, and non-profits to support reentry programs that provide the training, treatment, and supervision that individuals need when reentering their communities. For FY 2013, a total of $68.7 million was committed to this initiative. Learn more at www.bja.gov/ProgramDetails.aspx?Program_ID=90. The National Reentry Resource Center also disseminates news about grant solicitations from other federal agencies and foundations. http://csgjustice-center.org/nrrc/resources/funding-opportunities/

**National Criminal Justice Initiatives Map:** Included as part of the National Reentry Resource website is the National Criminal Justice Initiatives map. This map highlights federally funded reentry and related activities implemented throughout the country by geographic area. It includes Second Chance Act grants, as well as other federally funded programs. Click on your state to see what reentry resources are going to your state from a variety of sources and federal departments. http://csgjusticecenter.org/reentry/national-criminal-justice-initiatives-map/

**Second Chance and Other OJP Grantees, by Solicitation or State:** Use this link to search OJP grant awards by solicitation or state. http://ojp.gov/funding/funding.htm

**What Works in Reentry Clearinghouse (DOJ)** http://whatworks.csgjusticecenter.org/ This resource is a user-friendly, one-stop shop for practitioners and service providers seeking guidance on evidence-based reentry interventions, as well as a useful resource for researchers and others interested in reentry.

**Reentry Services Directory:** The National Reentry Resource website also includes a reentry services directory by state, including federal, state, and local agencies that deal with reentry activities, providing contact persons for each state. http://csgjustice-center.org/reentry/reentry-service-directories/

# The Federal Interagency Reentry Council

The Federal Interagency Reentry Council represents 20 federal agencies working to remove federal barriers to successful reentry for individuals who have served their time to compete for a job, attain stable housing, and support their families. The Reentry Council's mission is to make communities safer by reducing recidivism, assist those who return from prison and jail become productive citizens, and save taxpayer dollars. The Council has published a series of fact sheets on Reentry issues and policies. http://csgjusticecenter.org/nrrc/projects/firc/

**Reentry Council Snapshots:** Each Snapshot briefly describes the issue, summarizes Reentry Council accomplishments to date, lays out the Council's priorities moving forward, and points to key resources and links. http://csgjusticecenter.org/nrrc/projects/firc/snapshots/

**Reentry Council Mythbusters:** Reentry MythBusters are fact sheets designed to clarify existing federal policies that affect formerly incarcerated individuals and their families in areas such as public housing, employment, parental rights, Medicaid suspension/termination, voting rights and more. http://csgjusticecenter.org/nrrc/projects/mythbusters/

**Reentry Policy Documents and Resources:** This webpage (bottom half) includes links to federal resources on employment, education, child support, collateral consequences, children of incarcerated parents, and housing. http://csgjusticecenter.org/nrrc/projects/firc/snapshots/

Table of Contents

# Selected Federal Policy Documents and Other Resources

## Employment

Updated Guidance on Use of Criminal Records in Employment Decisions (EEOC)
The Equal Employment Opportunity Commission's revised guidance calls for employers to assess applicants on an individual basis rather than excluding everyone with a criminal record through a blanket policy. It provides new detail and direction for employers as to how to consider three key factors: (1) the nature of the job; (2) the nature and seriousness of the offense; and (3) the length of time since it occurred – both in writing a hiring policy and in making a specific hiring decision. The updated guidance also emphasizes that employers should not reject a candidate because of an arrest without a conviction, as arrests are not proof of criminal conduct. Questions and Answers concerning the EEOC Enforcement Guidance is available here.

Training and Employment Guidance Letter No. 31-11 (DOL)
The Department of Labor's Employment and Training Administration and Civil Rights Center issued a joint guidance for the public workforce system regarding employer job postings that contain hiring exclusions or restrictions based on arrest and conviction history.

Directive to Federal Contractors and Subcontractors (DOL)
DOL's Office of Federal Contract Compliance Programs issued a Directive advising federal contractors and subcontractors of their obligations regarding the use of criminal records as an employment screen.

Contractor Fitness Adjudication Best Practices Guide (OPM)
The Office of Personnel Management (OPM) has developed a best practices guide which addresses employment fitness adjudication for contractor applicants and employees who support Federal agencies.

### Fact Sheets for Employers and Employees

Background Checks: What Employers Need to Know

Background Checks: What Job Applicants and Employees Should Know
The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Federal Trade Commission (FTC) co-published two technical assistance documents that explain how the agencies' respective laws apply to background checks performed for employment purposes, including considerations of criminal records. One document is for employers; the other is for job applicants and employees.

## Housing

Secretary Donovan's Letters on HUD-assisted Housing: For Public Housing Executive Directors and Multi-family Property Owners (HUD)

The Secretary of Housing and Urban Development sent these letters to public housing executive directors and multi-family owners clarifying HUD's position on the eligibility of people with criminal records for public housing.

## Health and the Affordable Care Act (ACA)

**Health Reform/Criminal Justice webpage (supported by DOJ/BJA on the National Reentry Resource Center)** http://csgjusticecenter.org/reentry/issue-areas/health/health-policy/

**Implications of the Affordable Care Act on People Involved with the Criminal Justice System** http://csgjusticecenter.org/mental-health/publications/implications-of-the-affordable-care-act-on-people-involved-with-the-criminal-justice-system/

**SAMSHA health reform page** http://beta.samhsa.gov/health-reform

**Briefs covering 10 Ways the Justice Systems Can Help Link Returning Offenders to Health Insurance** http://csgjusticecenter.org/reentry/publications/ten-ways-to-link-individuals-involved-with-the-criminal-justice-system-to-health-insurance-new-resources-from-the-health-insurance-marketplace/

Table of Contents

## Education

Reentry Education Model (ED)
In partnership with other agencies, the Department of Education (ED) developed a research-based reentry education model, which is now being tested in the field.

Student Financial Aid Information (ED)
This information is geared to individuals with criminal histories or who are incarcerated or formerly incarcerated.

Take Charge of Your Future, Get the Education and Training You Need (ED)
This ED guide is intended for use by incarcerated or formerly incarcerated individuals. Additional publications related to community based correctional education, partnerships with community colleges, and ED's Reentry Education model are available here.

## Children of Incarcerated Parents

Children in Foster Care with Parents in Federal Prison: A Toolkit for Child Welfare Agencies, Federal Prisons, and Residential Reentry Centers (Federal Interagency Working Group for Children of Incarcerated Parents)
In 2007, 1.7 million children had a parent in prison on any given day, and even more have experienced parental incarceration at some point during their childhood. Parental incarceration can be associated with financial instability, unstable housing situations, school behavior and performance problems, and social stigma.

Children of Incarcerated Parents Initiative Fact Sheet (Federal Interagency Working Group for Children of Incarcerated Parents)
According to the Bureau of Justice Statistics, in 2007, an estimated 1.7 million children under the age of 18 had a parent in prison, an increase of almost 80 percent since 1991. The negative consequences for children with an incarcerated parent can be substantial, including financial instability, changes in family structure, shame, and social stigma. However, research also shows that supporting healthy and positive relationships between these vulnerable children, who are the innocent bystanders of adult decisions, and their families has the potential to mitigate negative outcomes.

## Veterans

U.S. Department of Veterans Affairs, Veterans Justice Outreach
The purpose of the Veterans Justice Outreach (VJO) Program is to avoid the unnecessary criminalization of mental illness and extended incarceration among Veterans by ensuring that eligible justice-involved Veterans have timely access to VHA services as clinically indicated. Veterans Justice Outreach Specialists are responsible for direct outreach, assessment, and case management for justice-involved Veterans in local courts and jails, and liaison with local justice system partners. Every VA medical center has at least one VJO Specialist.

U.S. Department of Veterans Affairs, Health Care for Reentry Veterans
The Health Care for Re-entry Veterans (HCRV) Program is designed to address the community reentry needs of incarcerated Veterans. HCRV services include: outreach and pre-release assessments services for Veterans in prison; referrals and linkages to medical, psychiatric, and social services, including employment services upon release; and short term case management assistance upon release.

## Collateral Consequences

Memorandum to Heads of Department of Justice Components and United States Attorneys (Office of Attorney General)
This memorandum was released by the Attorney General on August 12, 2013. It gives direction to the Department about consideration of collateral consequences in rulemaking.

Attorney General Holder's Letter on Collateral Consequences (DOJ)
The Attorney General sent a letter to every state Attorney General, encouraging them to review the collateral consequences in their states to determine whether those that impose burdens on individuals convicted of crimes without increasing public safety should be eliminated.

National Inventory on the Collateral Consequences of Criminal Convictions (DOJ)
A project of the National Institute of Justice of the U.S. Department of Justice, this resource assists lawyers, policymakers, individuals involved in the criminal justice system, and advocates in understanding the sanctions

Table of Contents

and restrictions that individuals may be subject to in a particular state as a result of a criminal conviction.

## Legal Aid

**Legal Aid Helps Successful Reentry (DOJ):**
Civil legal assistance can play a critical role for people leaving jail and returning to society, translating into reduced recidivism and increased chances for reintegration into the community. Securing an occupational license or an expungement for an eligible person may make the difference in that individual's ability to get a job. Preventing an illegal eviction may prevent homelessness and keep a family together. Legal aid and pro bono organizations can help address these and other barriers that keep people with criminal records from successful long-term reintegration.

**Legal Aid Resources by State:** This chart identifies both Legal Services Corporation (LSC) and non-LSC legal aid programs that recently reported offering reentry-related legal services. The list is not meant to be comprehensive. There may be other active reentry legal services projects, and other local legal aid and pro bono programs or projects willing to develop a reentry pro bono program and/or partner with other reentry social service providers. http://www.americanbar.org/groups/probono_public_service/resources/volunteer_opportunities/reentry_projects.html

## Child Support

PAID (Project to Avoid Increasing Delinquencies) Fact Sheet Series (HHS)
The PAID Initiative of the Office of Child Support Enforcement promotes activities to increase the collection of current child support and to prevent and reduce arrears. This fact sheet series shares research and innovative practices in child support systems.

Establishing Realistic Child Support Orders: Engaging Noncustodial Parents

Providing Expedited Review and Modification Assistance

Access to Justice Innovations

Realistic Child Support Orders for Incarcerated Parents

"Voluntary Unemployment," Imputed Income, and Modification Laws and Policies for Incarcerated Noncustodial Parents

# Other Federal Agency Reentry Websites

**National Federal Agency Contacts**
http://usanetsp.usa.doj.gov/staffs/otd/Documents/federal_contacts.pdf

**State Reentry Coordinators Network Listing**
http://usanetsp.usa.doj.gov/staffs/otd/Documents/State_contacts.pdf

**Bureau of Prisons, National Institute of Corrections Website**
http://nicic.gov/TPJC

**National Institute of Corrections: Evidence-Based Decision Making for Local Criminal Justice Systems:** This 2010 document provides an outline of the use of evidence-based practices in state reentry programs. http://usanetsp.usa.doj.gov/staffs/otd/Documents/NIC_2010.pdf

**Health and Human Services Reentry Website**
http://aspe.hhs.gov/hsp/11/Incarceration&Reentry/

**Court Services and Offender Supervision Agency (CSOSA):** CSOSA is a federal, executive branch agency created by Congress to undertake the offender supervision function for D.C. Code offenders. Their website contains not only reentry information specific to the District of Columbia, but also has a wealth of reentry information in multiple media formats, including radio and video interviews, briefs, and other information relevant on a national scale. http://media.csosa.gov

**Department of Labor Reentry Website**
www.doleta.gov/RExO/

**Social Security Administration Reentry Webpage**
Benefits After Incarceration: What You Need to Know
http://www.ssa.gov/reentry/

**CrimeSolutions.gov:** This resource from OJP uses rigorous research to determine what works in criminal justice, juvenile justice, and crime victim services. On it you will find research on program effectiveness reviewed and rated by expert reviewers, and easily understandable ratings based on the evidence that indicates whether a program achieves its goals. CrimeSolutions.gov

Table of Contents