UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

```
JANE DOE,
                              Petitioner,

            - versus -

UNITED STATES OF AMERICA,

                              Respondent.
```

MEMORANDUM
AND ORDER
15-MC-1174 (JG)

APPEARANCES:

GOLUB & GOLUB LLP
        225 Broadway, Suite 1515
        New York, NY 10007
By:     Mitchell A. Golub
        *Attorney for Petitioner*

ROBERT L. CAPERS
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
By:     David K. Kessler
        *Attorney for Respondent*

JONES DAY
        222 East 41st Street
        New York, NY 10017
By:     Todd R. Geremia
        *Attorney for Amica Curiae*

JOHN GLEESON, United States District Judge:

On June 23, 2015, Jane Doe moved to expunge a now thirteen-year-old fraud

conviction due to its adverse impact on her ability to work.  The conviction has proven

troublesome for Doe because it appears in the government's databases and in the New York City

Professional Discipline Summaries.  In other words, the conviction is visible to a prospective

employer both as the result of a criminal background check and upon examination of her nursing license. Numerous employers have denied Doe a job because of her conviction. On more than one occasion, she was hired by a nursing agency only to have her offer revoked after the employer learned of her record. Despite these obstacles, Doe has found work at a few nursing companies, and she currently runs her own business as a house cleaner. Doe's two children help to support her, and during periods of unemployment, her parents have also assisted her financially.

The government opposes Doe's motion, contending that federal district courts do not have subject matter jurisdiction to expunge a conviction on equitable grounds. The Second Circuit has ruled, however, that "[t]he application of ancillary jurisdiction in [expungement] case[s] is proper." *U.S. v. Schnitzer*, 567 F.2d 536, 538 (1977), *cert. denied*, 435 U.S. 907 (1978). Accordingly, I have weighed the equities in this case, which are grounded in my understanding of Doe's criminal conviction and sentence; I was the judge who presided over her jury trial and imposed punishment.

I conclude that while Doe has struggled considerably as a result of her conviction, her situation does not amount to the "extreme circumstances" that merit expungement. *See id.* at 539. That said, I had no intention to sentence her to the unending hardship she has endured in the job market. I have reviewed her case in painstaking detail, and I can certify that Doe has been rehabilitated. Her conviction makes her no different than any other nursing applicant. In the 12 years since she reentered society after serving her prison sentence, she has not been convicted of any other wrongdoing. She has worked diligently to obtain stable employment, albeit with only intermittent success. Accordingly, I am issuing Doe a federal certificate of rehabilitation. As explained below, this court-issued relief aligns with efforts the Justice

Department, the President, and Congress are already undertaking to help people in Doe's

position shed the burden imposed by a record of conviction and move forward with their lives.

BACKGROUND

In 2013, understanding a need to reduce the burgeoning prison population in the

United States, Attorney General Eric Holder launched a comprehensive review of the criminal

justice system to identify reforms that would ensure that federal laws are enforced both more

fairly and more efficiently.[1]  The "Smart on Crime" initiative identified five goals, one of which

is to "bolster . . . reentry efforts to deter crime and reduce recidivism."[2]  It makes sense that a

central aspect of the Justice Department's reentry goal is to help people with criminal records

find and keep jobs.  The Justice Department has recognized that:

> Each year, more than 600,000 individuals are released from state
> and federal prisons, and over 11 million cycle through local jails.  In
> addition, a broader population – approximately one in three U.S.
> adults – has an arrest record, mostly for relatively minor, non-violent
> offenses, and sometimes a result of crimes committed decades in the
> past. . . .  [P]articipation in pro-social behaviors like employment,
> education and civic engagement – the very things that people with
> criminal records are often barred from participating in – actually
> reduce[s] recidivism."[3]

---

[1]  U.S. Dep't of Justice, *About the Smart on Crime Initiative* (Dec. 1, 2015), http://www.justice. gov/ag/attorney-generals-smart-crime-initiative.

[2]  *Id.*

[3]  U.S. Dep't of Justice, *Second Chances Vital to Criminal Justice Reform* (July 30, 2015) [hereinafter *Second Chances*], http://www.justice.gov/opa/blog/second-chances-vital-criminal-justice-reform.

Indeed, study after study has shown[4] – and the government has repeatedly acknowledged[5] – that secure employment is one of the best ways to combat repeat criminal conduct.

Spurred by Smart on Crime, the Department's laudable efforts to connect people who have criminal records with jobs include: (1) requiring every U.S. Attorney to designate a reentry coordinator "whose sole purpose is to work on prevention and reentry efforts for the District";[6] (2) convening a Federal Interagency Reentry Council[7] "to reduce barriers to employment, so that people with past criminal involvement – after they have been held

---

[4]    *See, e.g.*, U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) 12, http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf ("those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%)"); Christopher Uggen, *Work as a Turning Point in the Life Course of Criminals: A Duration Model of Age, Employment, and Recidivism*, 65 Am. Soc. Rev. 529, 542 (2000) (concluding that "[o]ffenders who are provided even marginal employment opportunities are less likely to reoffend than those not provided such opportunities"); Miles D. Harer, Fed. Bureau of Prisons Office of Res. & Evaluation, *Recidivism Among Federal Prisoners Released in 1987* (1994), https://www.bop.gov/resources/research_projects/published_reports/recidivism/oreprrecid87.pdf (study of 1,205 people released from BOP custody revealed that those who arranged for post-release employment had a 27.6% recidivism rate compared to those who did not, who had a 53.9% rate).

[5]    *See, e.g.*, The White House, *Remarks by the President on Criminal Justice Reform* (Nov. 2, 2015) [hereinafter *Obama Criminal Justice Reform Speech*], https://www.whitehouse.gov/the-press-office/2015/11/02/remarks-president-criminal-justice-reform (President Obama's speech at Rutgers University: "[T]oday, instead of getting trouble on the streets, [Ashley Sinclair is] earning a paycheck cleaning up those streets. . . . We want more success stories like these. It's good for everybody. It means less crime. It means less recidivism."); Dep't of Justice, *In New Step to Fight Recidivism, Attorney General Eric Holder Announces Justice Department to Require Federal Halfway Houses to Boost Treatment Services for Inmates Prior to Release* (Mar. 24, 2014), https://www.justice.gov/opa/pr/new-step-fight-recidivism-attorney-general-holder-announces-justice-department-require (General Holder's statement in video message: "[W]e're doing more than ever to ensure that the tens of thousands of federal inmates who return to their communities each year have access to the . . . job training . . . so many need to break the cycle of poverty, criminality, and incarceration.").

[6]    U.S. Dep't of Justice, FY 2016 Budget Request 2, https://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/01/30/3._smart_on_crime_fact_sheet.pdf. The Department requested from Congress an increase of $10 million for the 2016 fiscal year to fund Reentry Coordinators in all 94 districts. *Id.* The total amount requested to support Smart on Crime was $247 million. *Id.* Congress allocated $15 million for prisoner reentry programs and for Reentry Coordinators in FY 2015. The White House, *The Budget for Fiscal Year 2015, Dep't of Justice* 103, https://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/justice.pdf.

[7]    *See Second Chances*, *supra* n.3 (The Federal Interagency Reentry Council is "a group comprised of representatives from more than 20 federal agencies that works to align and advance reentry efforts across the federal government with an overarching aim to not only reduce recidivism and high correctional costs, but also to improve public health, child welfare, employment, education, housing and other key reintegration outcomes.").

accountable and paid their dues – can compete for appropriate work opportunities in order to

support themselves and their families, pay their taxes, and contribute to the economy";[8] and (3)

instructing all U.S. Attorneys to "consider whether [new] regulation[s] or guidance [resulting in

collateral consequences][9] can be more narrowly tailored . . . to avoid imposing an unnecessary

burden on individuals reentering society."[10]

U.S. Attorney Offices ("USAOs") across the country are taking action. They are

hosting employment fairs,[11] organizing community reentry forums,[12] and participating in federal

---

[8]     U.S. Dep't of Justice, *Reentry Toolkit for United States Attorneys' Offices* (Mar. 2014) [hereinafter
*Reentry Toolkit*] 4, https://csgjusticecenter.org/documents/0000/1163/Reentry_Council_Reentry_Toolkit.pdf.

[9]     Collateral consequences are forms of "socially-condoned discrimination" imposed pursuant to
laws and policies that find a criminal conviction as grounds for disqualification. Amica Br., ECF No. 14-1, at 1-2.
Some consequences are related to the crime itself, such as prohibiting violent offenders from using firearms,
requiring sex offenders to register on a list and stay clear of school zones, and restricting those convicted of serious
traffic offenses from full use of their driver's licenses. *Id.* at 2. But some, as in Doe's case, amount to serious
restrictions that are unrelated to the offense conduct. *See id.*

[10]    Attorney General Eric Holder, *Memorandum to Heads of Department of Justice Components and
U.S. Attorneys* (Aug. 12, 2013), http://www.justice.gov/sites/default/files/ag/legacy/2014/04/11/ag-memo-collateral-
consequences.pdf.

[11]    The USAO for the Southern District of Alabama hosts job fairs as "the result of persistent effort
on the part of the U.S. Attorney," Kenyen Brown. *Reentry Toolkit, supra* n. 8, at 11. Mr. Brown also initiated
Project H.O.P.E., which convenes formerly incarcerated people, service providers, businesses, employers, non-
profits, and religious entities to find solutions to reentry issues, focusing on employment. U.S. Att'ys Office for the
S. Dist. of Ala*., Ex-Offender Re-Entry Initiative* (Jan. 13, 2016), http://www.justice.gov/usao-sdal/programs/ex-
offender-re-entry-initiative. Mr. Brown met with potential employers at the Mobile Chamber of Commerce to
discuss federal tax credits that may be available if they hire formerly incarcerated individuals. *Reentry Toolkit* at 11.

[12]    The District of Columbia USAO "has sought to be a leader in the Justice Department's efforts to
support the reentry of former offenders." U.S. Att'ys Office for the Dist. of Columbia*, Community Engagements*
(Feb. 29, 2016), http://www.justice.gov/usao-dc/programs/community-prosecution/community-engagements#ro.
Under the direction of former U.S. Attorney Ronald Machen, the office partnered with federal and local agencies, as
well as community-based organizations, to host Employer Reentry Forums to educate business leaders and the
community about the importance of supporting people who are returning from prison. *Reentry Toolkit* at 12. The
office also sponsored two unique symposia, in 2011 and 2013, to particularly address the needs of women making
the transition from incarceration into the community, and to raise public awareness on that set of issues. *Id.* at 13;
*see also* U.S. Att'ys Office for the Dist. of Columbia*, Press Release: Community Forum will Highlight Challenges
Facing Women Returning Home from Jail or Prison* (Apr. 6, 2011), http://www.justice.gov/archive/usao/dc/news/
2011/apr/11-131.pdf.

On February 5, 2014, former U.S. Attorney for the Northern District of Georgia (and current Deputy
Attorney General) Sally Yates hosted a Summit on Reentry in partnership with the Governor's Office of Transition,
Support and Reentry. U.S. Att'ys Office for the N. Dist. of Ga., 2014 Reentry Summit (Apr. 20, 2015),
http://www.justice.gov/usao-ndga/community-outreach/reentry-summit. The purpose of the summit was to convene

reentry courts[13] to help those with criminal convictions get back on their feet and walk out of the cycle that leads people from conviction to unemployment and back into the criminal justice system.

Attorney General Loretta Lynch, to her credit, has promoted and expanded on the achievements of her predecessor. On July 30, 2015, three months after taking office, she chaired her first meeting of the Federal Interagency Reentry Council and announced Daryl Atkinson as the Justice Department's first Second Chance Fellow.[14] Mr. Atkinson served 40 months in prison after pleading guilty to a non-violent crime. He faced a series of collateral consequences, including losing his driver's license, which made it difficult for him to secure a job. The Justice Department decided to name Mr. Atkinson a fellow so that he may serve as a colleague on the Reentry Council and as a representative to other reentry stakeholders.

---

the business community, the USAO, and formerly incarcerated people to correct public perceptions and dispel myths that affect reentry prospects. *Id.*

[13]       On April 17, 2014, the U.S. Attorney for the District of New Jersey, Paul Fishman, gave a keynote address at the "Prisoner Reentry: Breaking the Cycle" Conference sponsored by the Jersey City Mayor, Steven Fulop, and local groups. Integrity House, *Prisoner Reentry: Breaking the Cycle Conference to be Hosted by Jersey City Mayor Steven Fulop* (Apr. 10, 2014), http://patch.com/new-jersey/riverdell/prisoner-reentry-breaking-the-cycle-conference-to-be-hosted-by-jersey-city-mayor-steven-fulop_0b139be9. Mr. Fishman spoke about the challenges facing those with convictions on their records, and about the "ReNew" program, "the first federal reentry court in New Jersey." U.S. Att'ys Office for the Dist. of N.J., *Remarks as Prepared for Delivery by U.S. Attorney Paul J. Fishman at the Prisoner Reentry: Breaking the Cycle Conference* (Apr. 17, 2014), http://www.justice.gov/usao-nj/pr/remarks-prepared-delivery-us-attorney-paul-j-fishman-prisoner-reentry-breaking-cycle. The program invites formerly incarcerated individuals to the courthouse every Tuesday, where they find that:

> members of [the U.S. Attorney's Office] and court personnel are editing their resumes, teaching them how to interview for a job, and offering to tutor them in math. The judge is helping them to register for college, find apartments, and get jobs – and is literally taking them to a charter school to help them enroll their kids. Now that they have served their time, those defendants are being asked by lawyers and staff from that same U.S. Attorney's office [i.e., the one that advocated for their incarceration] and by a federal judge working with probation officers and public defenders, 'What do you need?'

*Id.*

[14]       *Second Chances*, *supra* n.3.

In addition, Mr. Atkinson will serve as an advisor to the Bureau of Justice Assistance's Second Chance programs. Pursuant to the Second Chance Act of 2007, state, local, and tribal governmental agencies and community organizations may receive federal grants for offering reentry services.[15] Since 2009 (the first year that the Second Chance Act was funded), Congress has authorized more than $479 million for grants,[16] and 700 grants have been awarded across 49 states.[17] General Lynch has praised the grantees for "offer[ing] critical assistance to populations at moderate and high risk of recidivism," such as reentry programs for youth offenders, assistance with finding stable housing for those with mental illness, and offering college credit to incarcerated individuals.[18] On October 1, 2015, General Lynch announced at the Washington Ideas Forum that the Justice Department would award $53 million in Second Chance grants for the 2015 fiscal year alone.[19] In the same month, she awarded $3 million to provide technology-based career training to incarcerated adults and juveniles to prepare them for release and connect them with follow-up career training after they reintegrate into their communities.[20] And just two months ago, General Lynch sat down with former and current

---

[15] *See Second Chance Act*, Bureau of Justice Assistance, https://www.bja.gov/ProgramDetails.aspx?Program_ID=90.

[16] *Id.*

[17] *Second Chance Act*, Justice Center: The Council of State Governments, https://csgjusticecenter.org/nrrc/projects/second-chance-act/.

[18] Dep't of Justice, *Attorney General Loretta E. Lynch Delivers Remarks at Second Chance Act – Justice and Mental Health Collaboration Program National Conference* (Dec. 16, 2015), https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-second-chance-act-justice-and-mental.

[19] *Id.*; *see also* Matt Ford, *The Justice Department Invests in Combatting Recidivism*, The Atlantic (Oct. 2, 2015), http://www.theatlantic.com/politics/archive/2015/10/lynch-wif-tk/408604/; *Washington Ideas Forum, Attorney General Loretta Lynch*, C-SPAN (Oct. 1, 2015), http://www.c-span.org/video/?328476-13/attorney-general-loretta-lynch-washington-ideas-forum.

[20] Office of the Press Secretary, The White House, *FACT SHEET: President Obama Announces New Actions to Promote Rehabilitation and Reintegration for the Formerly Incarcerated* (Nov. 2, 2015) [hereinafter

inmates at the Suffolk County House of Correction in Boston to learn about Suffolk County's

reentry services, which have had high success rates, to learn more about how and why those

programs have been working.[21]

The Justice Department's leadership comes at a critical time in our nation's

history, when criminal justice reform is at the forefront of the national agenda. President Obama

has undertaken a host of projects to facilitate reentry, including encouraging "ban the box"

legislation and directing the Office of Personnel Management to delay criminal history inquiries

in the federal hiring process.[22] The Senate Judiciary Committee also recently approved the first

bipartisan criminal justice reform bill in recent memory, the Sentencing Reform and Corrections

Act of 2015.[23]

The judiciary has an important role to play in addressing collateral consequences

of convictions in order to reduce recidivism. As President Obama stated in a speech at Rutgers

University last November:

> The goal is to prevent crime. The goal is to make sure that folks are
> fairly punished when they break the law. But the ultimate goal is to
> make sure that folks are law-abiding, self-sufficient, good citizens.
> And everything we do should be designed towards that goal. And if
> we're doing a good job there, then crime will go down and it will
> stay down.[24]

---

*White House Fact Sheet*], https://www.whitehouse.gov/the-press-office/2015/11/02/fact-sheet-president-obama-announces-new-actions-promote-rehabilitation.

[21]     Claudia Morales, *Three-quarters of Released Inmates Return to Prison . . . But Not in Boston* CNN (Jan. 20, 2016), http://www.cnn.com/2016/01/20/us/prison-recidivism-loretta-lynch-suffolk-county/.

[22]     *See White House Fact Sheet*, *supra* n.20.

[23]     *See* The Sentencing Reform & Corrections Act of 2015, http://www.judiciary.senate.gov/imo/media/doc/10-01-15%20Sentencing%20Reform%20and%20Corrections%20Act%20Section%20by%20Section.pdf.

[24]     *See Obama Criminal Justice Reform Speech*, *supra* n.5.

With this background in mind, I review Doe's motion.

FACTS

A. *Doe's Background and Crime*

Jane Doe is 57 years old. Dep. Tr.[25] at 8. She is not married, and she has two children aged 29 and 24. *Id.* at 8-9. Doe is from Jamaica and is a legal permanent resident of the United States. *Id.* at 9. She completed high school in Jamaica and also pursued studies in the U.S., where she obtained both her GED and her nursing license. *Id.*

On July 16, 2000, Doe participated in a fraudulent scheme that was not uncommon at the time. New York's no-fault insurance statute for automobile accidents provides that persons injured in car accidents are entitled to lost wages, medical coverage, and other expenses, and that those benefits are provided without regard to negligence or fault. *See* N.Y. Ins. Law §§ 5101 *et seq.* Corrupt health care professionals, lawyers, and others exploited this no-fault scheme by staging car accidents and receiving payments for injuries never suffered and services never rendered.

According to her presentence report, Doe's adjusted gross income was less than $15,000 in each of the two years preceding her offense. She was raising two young children on her own and receiving only $80 per week in child support from their father. Her boyfriend at the time recruited her to participate in a staged car accident. She picked him up in her car, along with two of their friends, and purposely drove through an intersection when another vehicle hit her car in the rear driver's side. Three to four days after the accident, she allegedly felt stiffness in her neck and consulted a physician. Doe attended physical therapy twice a week from September to December 2000. Her auto insurance company was billed $2,604 and paid $1,190

---

[25] To protect confidentiality, Doe's deposition transcript is not in the public file.

for her no-fault claim, and it held a reserve of $5,500 for her bodily-injury claim.[26]  Doe did not receive any money from the offense.

A jury found Doe guilty of conspiring to commit and committing health care and mail fraud following her trial on October 3, 2002.  *See* Jury Verdict, *United States v. Hawkins*, No. 02-CR-1077 (E.D.N.Y.).  It was her first and only criminal conviction to date.  As a result of the conviction, Doe and her young children were evicted from her Queens apartment.  She sent her children to live with their half-sister in Far Rockaway; Doe moved into her then-boyfriend's aunt's basement in a different part of Brooklyn.

On February 21, 2003, I sentenced Doe to 15 months imprisonment, a three-year term of supervised release, and $14,819.18 in restitution.  *See* Judgment, *Hawkins*.  Doe completed her prison sentence in 2004.  In the meantime, she appealed her case, and on April 22, 2005, the Second Circuit remanded for resentencing pursuant to *United States v. Booker*, 543 U.S. 220 (2005).  *See United States v. Hawkins*, 125 Fed. App'x. 364, 365 (2d Cir. 2005).  On October 22, 2012, I reduced Doe's term of imprisonment to 11 months and amended her restitution amount to $7,409.60.  *See* Amended Judgment, *Hawkins*, ECF No. 379, 380.  I also determined that her three-year term of supervised released had been served and no additional supervision was required.  *Id.*

B. *Doe's Employment History Following Release from Prison*

After being released from prison in 2004, Doe experienced both periods of employment and unemployment in the nursing field.  Shortly after her release, Doe was able to

---

[26]    Doe also contacted an attorney through the Yellow Pages to file a personal injury lawsuit on her behalf.  According to her presentence report, the lawyer only filed a notice of claim; no further action was taken.

go back to the nursing agencies she worked for prior to her conviction because there was no need for an additional criminal background check:

> They didn't know. When you work with an agency, and I usually choose to work with an agency. They don't know, you determine when you work and when you don't work. So they don't know what happened within that period of time, they don't know. So I just went back to work.

Dep. Tr. at 48. According to her probation file, on September 9, 2004,[27] Doe confirmed with her probation officer that she had secured employment with her former employer, Agency One,[28] which provides nurses for home care and hospice needs. *See also id.* at 42. A December 30, 2004 pay statement shows that Doe earned $30,134.00 working for Agency One in 2004. *See also id.* at 44. Doe continued working for the agency through 2005, and her pay stubs show that she had made $47,813.50 by September 23 of that year. *See also id.* at 46. Doe also worked for a second nursing agency, Agency Two, during the two years following her release. *Id.* at 43. Neither employer knew of Doe's conviction or time in prison. *Id.* at 48. Monthly notes in her probation file show that Doe's total monthly income met her monthly expenses during this period.

In 2006, Doe's employment prospects and ability to support her family took a significant turn. She was found guilty of professional misconduct by the New York State Office of Professional Discipline as a result of her conviction. Golub Decl. ("Pl. Br."), ECF No. 1, at 2. Her nursing license was suspended in September 2006 for two years, with the last year stayed, and Doe was placed on probation for an additional two years. *Id.* at n.1. Doe's "license was not

---

[27]     It appears from the file that Doe may have been working with both a different agency and a nursing home during July and August 2004, but by September 2004, her primary employer was Agency One. It appears that both employers were unaware of her supervision status.

[28]     Doe's former employers are not named in this opinion to preserve confidentiality.

suspended because [she] did something in the nursing filed, they based this on the criminal record." Dep. Tr. at 87. Doe told her probation officer in October 2006 that she would "seek alternative employment." In November, she was working towards starting her own agency of home health attendants. She later explained that she attempted to start the agency "[b]ecause work wasn't easy to get, and I figured if I started my own business I don't have to deal with the conviction that I was dealing with." *Id.* at 83. In 2008, she told the Court, "I was already turned down once in applying for my business license and I'll be trying again in April of this year." *See* Mot. to Expunge, *Hawkins*, ECF No. 373, at 3. Ultimately, Doe was unable to acquire this license "because of the conviction." Dep. Tr. at 84.

Doe remained unemployed for the entire two years that her conviction caused her nursing license to be suspended. *Id.* at 49. The probation file reveals a woman who very much wanted to work, even if that meant trying to start her own business. In the end, Doe had to rely on her parents for support, and they moved in with her. Her mother paid a lawyer to appeal her license suspension, but the appeal was unsuccessful.

Once the suspension was lifted, Doe went straight back to work. From 2008 to 2011, Doe held three non-concurrent jobs. She submitted an application and was hired at Agency Three, where she worked in a nursing facility. *Id.* at 52-53. Doe is unsure if Agency Three checked the status of her nursing license before offering her employment. *Id.* at 53-54. She stopped working at Agency Three when they went out of business. *Id.* at 55. Thereafter, Doe applied and was hired at Agency Four, a home care service, but got referrals only "sporadic[ally]" from 2009 to 2011. *Id.* at 56. She explained, "I wasn't getting cases from them. They never told me, 'Oh, I can't hire you because I saw [your conviction],' they never told me that. I'm not sure why I wasn't getting cases. But in the back of my mind usually that's what it

is." *Id.* Doe did not disclose her criminal conviction to Agencies Three or Four. *Id.* at 54. She then worked for Agency Five "for a period of time, maybe about a year," providing hospice care. *Id.* at 56-57. She stopped working at Agency Five in 2011 after a man complained that she wanted to give medication to his wife. *Id.* at 57.

From 2011 to 2013, Doe could not work because she was having serious health problems. *Id.* at 60-61. Her mother and siblings helped to support her during that period. *Id.* at 61. She was hospitalized twice during this time and underwent radiotherapy. *Id.* The therapy helped, and Doe went back to work in 2013. *Id.*

That year, Doe applied for jobs at Agencies Six, Seven, Eight, and Nine. At her interview with Agency Six, she was asked if she had a criminal record, and she answered "no." *Id.* at 64. She worked for Agency Six doing short-term home care for less than a year. *Id.* at 63-64. Doe stopped working there when "[t]hey stopped calling" with case referrals and provided no explanation. *Id.* at 64. Agency Seven did not hire Doe and told her that "they saw the conviction on [her] license." *Id.* at 23-24. The agency said "they couldn't give [Doe a] case," *id.* at 24, because "a background check revealed a criminal conviction, and that information would be forwarded to facilities being sent [her] resume." *Id.* at 25. Similarly, Agency Eight accepted Doe's application and interviewed her, but "[w]hen [she] called, they told [her] that they didn't have the need right now, which to [Doe] was weird. They call[ed her] for the interview saying they [were] ready to hire. So then to say they didn't have the need didn't make sense." *Id.* at 66-67. Doe also testified that a representative from Agency Eight "called me up[,] she was really upset, she said I didn't tell her, she said she saw [the conviction] on my license, so I couldn't get the job. *Id.* at 21-22. Doe then applied for a job at Agency Nine. It does not appear that she was hired or given an explanation for that decision. *Id.* at 67-68.

In 2014, Doe applied for a job at Agency Ten. *Id.* at 68. She stated on her application that she did not have a criminal record. *Id.* at 72. She was told Agency Ten would do a background check. *Id.* At her interview, Doe stated, "I had the impression I got the job. All that was [left] for me to get [was] the date to start." *Id.* at 72-73. Doe did not end up getting the job, and she was not given a reason why. *Id.* at 72. Doe was able to find work from March to August at Agency Eleven. Dep. Tr. at 69. She got the job by applying, and ended up working with two patients – one "regular" and one "just visits." *Id.* She stopped working for Agency Eleven because her "regular" patient passed away. *Id.* at 70. Doe applied for "a lot of job[s]" in 2014, but recalls only two. *Id.* Doe's daughter, who lives with her and is employed, helped to support her. *Id.* at 69.

In April 2014, Doe successfully registered her own house-cleaning company. *Id.* at 77. She has "done a few" houses so far, and is making "[a] little bit" of money. *Id.* at 78.

In 2015, Doe applied for a few different jobs, but with little success. She found an advertisement on Craigslist from a woman seeking a home nurse. *Id.* at 20. Doe made an appointment to meet with the woman, who later called to tell Doe that "she usually [background] checks her nurses, and she saw that there were two [Jane Does]." *Id.* at 21. Doe testified, "I just didn't answer her question. I told her I would call, but never had taken any more of her calls." *Id.* Doe decided against following up because she believed she would not be hired if she identified herself as someone with a conviction. *Id.* at 75.

In April, Doe got a job at Agency Twelve that would have required her to travel, only to have the offer rescinded at the last minute:

> I applied for a travel job and I was called by [Agency Twelve], and I got a case and I did the online application and everything, and I was given the job by the facility. And I got my plane ticket, I got a car rental where I was going to live and everything. I got the date I

was to leave, which I think was April 10 I think it was. . . . And then they called me and said they run my license and saw where I had a conviction, so they had to withdraw."

*Id.* at 18.

Shortly thereafter, Doe "got a call from another place and they offered me the job." *Id.* at 19.  Doe testified, however, that, "They called me after they checked my license. They called me and they told me that they couldn't give me the job because they saw where I had the conviction on my license." *Id.*  Doe also re-applied for a job at Agency Nine and gave permission for a background check. *Id.* at 76.  No one from the agency ever contacted her. *Id.* at 77.

Despite her persistence in trying to find employment in her chosen profession, Doe's conviction has caused her disappointment time and time again.  She continues to make ends meet through profits from her house cleaning business and support from her daughter, who "pays the bills." *Id.* at 77-78.  Doe is understandably very frustrated with her situation:

> "[W]hatever application that you do that question [about any prior convictions] is there.  Even when – like I said before, I went to a nursing agency and that question was there and they denied me. That question – I tried to do a driving thing, Uber, a car thing.  I tried and the question was there.  So I sat down to a few applications where the question is there.  I just feel intimidated when I see that question, because I know they're not giving [jobs to people with convictions].  If you put yes on there, that's it.  You are not getting that job.

*Id.* at 79.[29]  Doe is unable to plan or invest in her future: "Right now I'd like to buy a car and I can't because my credit is shot.  I don't have the cash to – I would not be [not] working because I want to." *Id.* at 80.  She would like "a[c]cess in the [] democracy of this country," but her conviction prevents her from being able to vote.  Mot. to Expunge, *Hawkins*, at 2-3.  During the

---

[29]     Doe did not complete the application to become an Uber driver.  Dep. Tr. at 80.

years her children attended college, Doe wanted "to be financially secure so that [she could] help them but it [was] very hard, [her being] a single mom and all." *Id.* at 3. She has sought expungement of her conviction because "this thing is in my way, preventing me from doing anything." Dep. Tr. at 80.

C. *Doe's Motion for Expungement*

This is Doe's second motion to expunge; she previously filed a similar motion on March 27, 2008. *See* Mot. to Expunge, *Hawkins*. The government did not respond to that motion. I denied the motion on July 1, 2008. Doe also submitted a motion for a writ of error *coram nobis* on May 22, 2013 seeking to vacate her conviction and sentence. *See* Mot. for Writ of Error Coram Nobis, *[Jane Doe] v. United States*, No. 13-CV-3004 (E.D.N.Y.), ECF No. 1. I denied that motion on November 15, 2013, *see Doe*, ECF No. 10, and the Second Circuit affirmed on December 30, 2014. *See Doe*, ECF No. 13.

Doe seeks an order expunging her conviction from the records maintained by the government. *See* Pl. Br; Dep. Tr. at 86-87. She understands that I do not have jurisdiction to order the New York State Office of Professional Discipline to expunge her professional discipline record. Dep. Tr. at 86-87. The government might have responded by engaging in an effort to help Doe seek employment, *see supra* pp. 5-6, but it chose instead to oppose Doe's motion on the ground that I should not review it at all.

DISCUSSION

A. *Subject Matter Jurisdiction*

The government first argues that Doe's motion to expunge should be denied because this Court does not have subject matter jurisdiction to hear such a motion. *See* Resp. ("Gov't Br."), ECF No. 8, at 6. Specifically, the government contends that district courts never

have ancillary jurisdiction to expunge lawful criminal convictions on purely equitable grounds. *Id.* While other circuits have agreed with that position, controlling Second Circuit precedent establishes that "expungement lies within the equitable discretion of the [district] court." *Schnitzer*, 567 F.2d at 539. Because I am bound by that precedent, Doe's motion will be heard.

      *Schnitzer* concerned a motion to expunge an individual's arrest record and to secure the return of his fingerprints and photographs following the dismissal of an indictment against him. *Id.* at 537. The district court denied the motion upon examining the underlying facts, stating, "the interests of the government in effective law enforcement outweigh those of the defendant." *Id.* at 538 (internal quotation marks omitted). The government appealed, arguing that the district court did not have jurisdiction to hear the motion in the first place. *Id.* The Second Circuit disagreed, holding that the district court had ancillary jurisdiction over the question. *Id.* Acknowledging that "[t]he Attorney General is required by 28 U.S.C. § 534(a) to acquire and retain criminal identification records," and that "[n]o federal statute provides for expungement of an arrest record," the Second Circuit stated that "[i]nstead, expungement lies within the equitable discretion of the court." *Id.* at 539. To determine whether expungement is warranted, "courts have considered the delicate balancing of the equities between the right of privacy of the individual and the right of law enforcement officials to perform their necessary duties." *Id.* (internal quotation marks omitted). The court determined that Schnitzer's circumstances were not so "extreme" as to merit the relief he was seeking. *Id.*; *see also id.* at 540 ("While courts need not wait for substantial damage to occur before taking remedial equitable action, there is no evidence that harsh damage will indeed accrue.").

      District courts within the circuit have frequently invoked *Schnitzer*'s holding to rule on expungement motions. *See, e.g.*, *Joefield v. United States*, No. 13-MC-367, 2013 WL

3972650 (E.D.N.Y. Aug. 5, 2013); *United States v. Sahadeo*, No. 94-CR-3, 2011 WL 5828339,

(S.D.N.Y. Nov. 17, 2011); *Doe v. Immigration & Customs Enforcement*, No. M-54, 2004 WL

1469464 (S.D.N.Y. June 29, 2004); *United States v. Doe*, No. 71-CR-892, 2004 WL 1124687

(S.D.N.Y. May 20, 2004).  In addition, in the years following *Schnitzer*, several circuit courts

similarly held that a district court may use its inherent equitable powers to order the Executive to

expunge arrest and/or conviction records in narrow circumstances.[30]

However, some circuits, including some of the circuit courts noted above, have

ruled that *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), requires the conclusion that

federal courts lack subject matter jurisdiction over applications to expunge convictions on

equitable grounds.[31]  Nonetheless, other circuits have reaffirmed their original holdings since

---

[30]     *See United States v. Pinto*, 1 F.3d 1069, 1070 (10th Cir. 1993) ("We have stated that, in extreme circumstances, an arrest record may be expunged after dismissal of the charges or acquittal." (citing *United States v. Friesen*, 853 F.2d 816, 817 (10th Cir. 1988))); *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) ("Indeed, we have sanctioned the remedy of expunction of criminal records in civil rights cases involving unconstitutional state convictions." (citations omitted)); *United States v. Noonan*, 906 F.2d 952, 956 (3d Cir. 1990) ("Clearly, a federal court has the inherent power to expunge an arrest and conviction record." (citations omitted)); *Geary v. United States*, 901 F.2d 679, 679 (8th Cir. 1990) ("Our Circuit has held, however, consistent with other circuits, that a federal court may exercise its inherent equitable powers by ordering the Attorney General to expunge criminal records in a particular case, provided that the case presents extraordinary circumstances . . . ." (citations omitted)); *Reyes v. Supervisor of Drug Enforcement Admin.*, 834 F.2d 1093, 1098 (1st Cir. 1987) ("[T]he court below did not commit reversible error by refusing to exercise its equitable discretion to expunge Reyes' [DEA] files." (citation omitted)); *Livingston v. U.S. Dep't of Justice*, 759 F.2d 74, 78 (D.C. Cir. 1985) ("It is well established, and undisputed by the parties to this case, that courts have the inherent, equitable power to expunge arrest records."); *Allen v. Webster*, 742 F.2d 153, 155 (4th Cir. 1984) ("[T]he district court did not abuse its equitable discretion in denying the requested relief of expungement.  It is a relief confined to 'exceptional circumstances.'" (citing *Schnitzer*); *see also United States v. Flowers*, 389 F.3d 737, 739 (7th Cir. 2004) ("district courts do have jurisdiction to expunge records maintained by the judicial branch" (citing *United States v. Janik*, 10 F.3d 470, 472 (7th Cir. 1993))).  *But see Janik*, 10 F.3d at 472 ("federal courts are without jurisdiction to order an Executive Branch agency to expunge what are admittedly accurate records of a person's indictment and conviction"); *United States v. Scott*, 793 F.2d 117, 118 (5th Cir. 1986) (expressing "grave doubts" that district courts have equitable power to consider expungement in light of the Executive's province to grant pardons, but deciding to "leave for another day the separation of powers issue").

[31]     *See United States v. Lucido*, 612 F.3d 871, 875 (6th Cir. 2010) (analyzing *Kokkonen* in "holding that the federal courts lack ancillary jurisdiction to consider expungement motions directed to the executive branch"); *United States v. Coloian*, 480 F.3d 47, 52 (1st Cir. 2007) ("Thus, *Kokkonen* forecloses any ancillary jurisdiction to order expungement based on Coloian's proffered equitable reasons."), *distinguishing Reyes*, 834 F.2d 1093; *United States v. Meyer*, 439 F.3d 855, 859-60 (8th Cir. 2006) ("In light of the Supreme Court's instruction narrowing the scope of ancillary jurisdiction in *Kokkonen*[], we are convinced that a district court does not have ancillary jurisdiction to expunge a criminal record based solely on equitable grounds."), *distinguishing Geary*, 901 F.2d 679; *United States v. Dunegan*, 251 F.3d 477, 479 (3d Cir. 2001) ("We do not believe that [the] purposes [of

*Kokkonen.  See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 535-37 (D.C. Cir.

2015); *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1234 (10th Cir. 2001) ("It is well

settled in this circuit that courts have inherent equitable authority to order the expungement of an

arrest record or a conviction in rare or extreme circumstances.").

   I find the shift of some circuits, spurred by *Kokkonen*, perplexing.  *Kokkonen*

concerned the ancillary jurisdiction of a district court over a contract dispute.  The Supreme

Court held that district courts lack the jurisdiction to hear a breach of settlement contract claim

where consideration for that settlement contract was dismissal of an earlier federal suit.

*Kokkonen*, 511 U.S. at 376-77.  The Court stated that ancillary jurisdiction generally serves two

purposes:

> (1) to permit disposition by a single court of claims that are, in
> varying respects and degrees, factually interdependent; and (2) to
> enable a court to function successfully, that is, to manage its
> proceedings, vindicate its authority, and effectuate its decrees.

*Id.* at 379-80 (internal citations omitted).  Applying that rationale for ancillary jurisdiction, the

Court stated, "The facts to be determined with regard to [] breaches of contract are quite separate

from the facts to be determined in the principal suit, and automatic jurisdiction over such

---

ancillary jurisdiction as stated in *Kokkonen*] contemplate a petition for the expungement of a criminal record."),
*distinguishing Noonan*, 906 F.2d 952; *United States v. Sumner*, 226 F.3d 1005, 1014 (9th Cir. 2000) (applying
*Kokkonen* and deciding, "We do not agree, however, that a district court has the power to expunge a record of a
valid arrest and conviction solely for equitable considerations."), *distinguishing Smith*, 940 F.2d 395.  District courts
in the Fourth and Eleventh Circuits have also decided that *Kokkonen* precludes ancillary jurisdiction over
expungement on equitable grounds.  *See, e.g.*, *United States v. Harris*, 847 F. Supp. 2d 828, 831-36 (D. Md. 2012);
*United States v. Paxton*, No. 3:99CR91, WL 2081483, at *2 (M.D. Ala. July 20, 2007).

  Even so, several circuits have preserved the jurisdiction to expunge criminal conviction records where the
validity of the underlying conviction is challenged.  *See United States v. Field*, 756 F.3d 911, 915 (6th Cir. 2014)
("But where motions for expungement challenge an unconstitutional conviction or an illegal arrest or are otherwise
based upon a constitutional claim, federal courts may have jurisdiction to consider the motion."); *Tokoph v. United
States*, 774 F.3d 1300, 1035-36 (10th Cir. 2014); *Meyer*, 439 F.3d at 861-62; *United States v. Rowlands*, 451 F.3d
173, 177 (3d Cir. 2006); *Sumner*, 226 F.3d at 1014; *Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 699 (5th Cir.
1997) (requiring party seeking expungement to assert "an affirmative rights violation by the executive actors holding
the records of the overturned conviction"); *accord Melawer v. United States*, 341 F. App'x 83, 84 (5th Cir. 2009).

contracts is in no way essential to the conduct of federal-court business." *Id.* at 381. In my

view, *Kokkonen* has little application to the jurisdictional question at issue here. *See Lucido*, 612

F.3d at 878 (Batchelder, J. dissenting) ("the present case is [not] exactly on point with

*Kokkonen*"); *see generally Abdelfattah*, 787 F.3d 524 (no discussion of *Kokkonen*); *accord*

*Camfield*, 248 F.3d 1214; *Sealed Appellant*, 130 F.3d 695.

    In any event, *Schnitzer* was animated by the same rationale that drove *Kokkonen*.

*Schnitzer* cited to *Morrow v. District of Columbia*, 417 F.2d 728 (D.C. Cir. 1969), which held

that ancillary jurisdiction is proper in two circumstances: (1) for the purposes of "judicial

economy; disputes related to a single dispute should be resolved in the original forum"; and (2)

"to insure that a judgment of a court is given full effect." *Id.* at 740 (citations omitted). The

Second Circuit's stated reliance on *Morrow* provided a basis for its exercise of ancillary

jurisdiction over Schnitzer's motion to expunge: for the purposes of "judicial economy."

*Schnitzer*, 567 F.2d at 538. Because *Schnitzer* grappled with the rationale of *Kokkonen*, its

holding remains undisturbed by that case – and indeed, consistent with it.[32]

    The exercise of ancillary jurisdiction over Doe's motion serves both of the

purposes identified in *Morrow* and *Kokkonen*. First, Doe's criminal case and her expungement

motion are "factually interdependent." The equities to be balanced in deciding the latter include

the severity of her crime and her role in it – all facts that surfaced at her trial, which I presided

over. Second, I sentenced Doe to a punishment that was not supposed to continue indefinitely.

Accordingly, I have an interest in ensuring that the sentence is "effectuated" properly. As the

---

[32]  Since *Kokkonen*, the Second Circuit has not overruled *Schnitzer* but instead has cited to it as good law. *See United States v. Amerson*, 483 F.3d 73, 86 (2d Cir. 2007) (citing *Schnitzer*); *accord Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006) ("[W]e held that the district court had ancillary jurisdiction to address a motion by a criminal defendant to have his arrest record expunged."); *United States v. Dransfield*, No. 96-1118, 1996 WL 537919, at \*3 (2d Cir. 1996) ("Expungement is within the equitable discretion of the court, and should only be exercised in the most extreme circumstances.").

Second Circuit stated in *Field v. United States*, "[t]he jurisdiction of a court is not exhausted by the rendition of its judgment, but continues until that judgment is satisfied." 193 F.2d 86, 90 (2d Cir. 1951) (internal quotations marks and citation omitted). Judge Cudahy concluded as much in his opinion in *Janik*:

> Although the majority suggests that separation of powers considerations preclude judicial expungement of *agency* records, it seems to me that the relation of the federal courts to law enforcement agencies is so close as to validate as a practical matter judicial surveillance of closely related agency files. Agency files essentially record events transpiring in the courts, with respect to which courts have a continuing interest. Practical considerations here should be of sufficient weight to override any theoretical separation of powers objections.

*Janik*, 10 F.3d 470, 473 (Cudahy, J. concurring and dissenting); *see also Doe v. United States*, 110 F. Supp. 3d 448, 454 n.16 (E.D.N.Y. 2015) ("[F]ew things could be more essential to 'the conduct of federal-court business' than the appropriateness of expunging the public records that business creates.").

In sum, because *Schnitzer* is the controlling case on this issue, this Court is well within its authority to rule on Doe's motion.

B. *Doe's Motion for Expungement*

While *Schnitzer* gives me the jurisdiction to hear Doe's motion, its standard unfortunately does not permit me to grant it. *Schnitzer* states that expungement "should be reserved for the unusual or extreme case." 567 F.2d at 539 (internal quotation marks and citation omitted). "Any particular request for expungement must be examined individually on its merits to determine the proper balancing of equities," *id.* at 540, which include "the right of privacy of the individual and the right of law enforcement officials to perform their necessary duties." *Id.* at 539. Doe has had significant trouble getting and keeping jobs as a result of her conviction. Her

status as a single mother and a woman of color has made things even harder for her.[33]  However, there are reasons besides the conviction that Doe has lost jobs or been declined offers, including patient complaints and the usual ebb and flow of clientele.  The government argues that Doe's misrepresentations about her conviction to prospective employers are just as (if not more) likely to have cost her job opportunities rather than the conviction itself.  Gov't Br. at 19-20.  But, even if Doe's "lies" were the only reason her job offers were rescinded – a proposition I find unlikely – she can hardly be faulted for being less than forthcoming about her conviction when it has closed so many doors for her.

In any event, although it is the relief she seeks, it is not clear to me that expungement would significantly help Doe, as her conviction will still appear on her nursing license and in private criminal record databases.  I commend Doe for successfully getting hired by multiple nursing agencies over the years and starting her own business despite the obstacles she has faced.  I believe she may have more luck if she applies for jobs outside of her chosen profession as well.  For the foregoing reasons, I believe Doe's situation is "not harsh or unique," and therefore deny her motion to expunge.  *See Schnitzer*, 567 F.2d at 540.

C. *Federal Certificate of Rehabilitation*

While Doe's situation does not present the extreme circumstances that warrant expungement, it does merit a lesser form of relief.  I sentenced Doe to incarceration and

---

[33]     *See* George Lipsitz, *"In an Avalanche Every Snowflake Pleads Not Guilty": The Collateral Consequences of Mass Incarceration and Impediments to Women's Fair Housing Rights*, 59 UCLA L. REV. 1746 (2012) (discussing the distinct collateral injuries that Black and Latina women face due to under-enforced fair housing and fair employment laws); Dorothy E. Roberts, *Prison, Foster Care, and the Systemic Punishment of Black Mothers*, 59 UCLA L. REV. 1474 (2012) (analyzing how the foster care and prison systems work together to punish Black mothers); Ifeoma Anjuna, *The Modern Day Scarlet Letter*, 83 FORDHAM L. REV. 2999, 3016-17 ("Black children of incarcerated mothers are more likely to be in foster care than their counterparts, making regaining custody of their children much harder for formerly incarcerated Black women.  Some legal scholars . . . have made the argument that African American women, because of their gender and race, are the most disproportionately impacted by the collateral legal consequences of criminal conviction.") (footnotes omitted).

supervision to punish her for committing a federal offense, to deter her from breaking the law again – and to help her achieve the latter goal.  It seems that the sentence had its intended effect; aside from the conviction in this case, Doe's record is clean.  There is no longer a need to deprive Doe of her liberty interests in the way collateral consequences imposed by the law have been doing.  As her sentencing judge, I owe it not only to Doe, but to her family and community, to do my part to lift any remaining hardship on her.

Most prospective employers do not have the time or resources to gain a comprehensive understanding of who Doe is, and then to figure out what weight, if any, her conviction should play in the hiring process.  So I have done that for them.  I have reviewed each page of Doe's trial transcript, presentence report, probation reports, deposition transcript, and other documents she and the government provided to me for a holistic view of her character and competency today.  I find that there is no relationship between Doe's conviction and her fitness to be a nurse.  *See* N.Y. Correct. Law § 752 (prohibiting the denial of employment unless there is a "direct relationship" to the offense of conviction[34] or "the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public"); N.Y. Exec. Law § 296(15) (making unlawful the denial of employment due to a finding of moral character based on a criminal conviction).  Any legitimate impact that her fraudulent actions more than 15 years ago may have had on her suitability for employment no longer exists.  Jane Doe is rehabilitated.  *See Stephenson v. United States*, No. 10-MC-712, 2015 WL 5884810

---

[34]     According to New York law, even if there is a "direct relationship," an employer must also consider: (1) the public policy of the state to encourage employment of people with criminal records; (2) the specific duties and responsibilities necessarily related to the employment sought; (3) the bearing, if any, of the criminal offense underlying the conviction on the applicant's fitness to perform the required duties and responsibilities; (4) the time that has elapsed since the offense conduct; (5) the age of the person at the time of the offense; (6) the seriousness of the offense; (7) rehabilitation and good conduct; (8) the legitimate interest of the employer in protecting property, and the safety and welfare of specific individuals or the general public.  N.Y. Correct. Law § 753.

(E.D.N.Y. Oct. 8, 2015), *5 ("As the Court that sentenced Ms. Stephenson over twenty years ago, I am hopeful that a licensing board will take seriously my conclusion that Ms. Stephenson is of sound moral character and well-suited for the nursing profession.").  I am providing her with a federal certificate of rehabilitation that memorializes my conclusion so that future employers may benefit from it.  I hope they will give my careful consideration of Doe's current suitability for employment significant weight, and conclude that it far outweighs the effect of her aberrant criminal conduct all those years ago.

1.  *Certificates of Rehabilitation in the State System*

There are two general approaches to limiting the collateral consequences of convictions: (1) the "forgetting" model, in which a criminal record is deleted or expunged so that society may forget that the conviction ever happened; and (2) the "forgiveness" model, which acknowledges the conviction but uses a certificate of rehabilitation or a pardon to symbolize society's forgiveness of the underlying offense conduct.  David J. Norman, *Stymied by the Stigma of a Criminal Conviction: Connecticut and the Struggle to Relieve Collateral Consequences*, 31 QUINNIPIAC L. REV. 985, 1006 (2013).  The forgiveness model, which preserves the public record of a conviction, is gaining favor in the reentry community for both functional and philosophical reasons.  *See* Amica Br. at 3.  Where expungement relief is unavailable or otherwise unhelpful, I believe a certificate of rehabilitation can significantly alleviate the collateral effects of a criminal record by emitting a powerful signal that the same system that found a person deserving of punishment has now found that individual fit to fully rejoin the community.

Like many good reentry ideas, certificates of rehabilitation are largely a product of the state system.  Several states now issue such relief in various forms.  New York has the

oldest and most robust certification system. Norman at 1014. It offers two types of certificates: a Certificate of Relief from Disabilities, N.Y. Correct. Law §§ 701-03, and a Certificate of Good Conduct. *Id.* §§ 703-a, 703-b. The legislature enacted statutes authorizing issuance of these certificates in the late 1940s. Joy Radice, *Administering Justice: Removing Statutory Barriers to Reentry*, 83 U. COLO. L. REV. 715, 733 (2012). The certificates continued to evolve into the mid-1970s, when states were prioritizing rehabilitation in penal reform. *Id.* Governor Hugh Carey expressed his support for expanding the legislation in 1976, stating, "The great expense and time involved in successfully prosecuting and incarcerating the criminal offender is largely wasted if upon the individual's return to society, his willingness to assume a law-abiding and productive role is frustrated by senseless discrimination." *Id.* at 722. Governor Carey understood what reformers are still saying today – if we want formerly incarcerated people to become upstanding citizens, we should not litter their paths to reentry with stumbling blocks.

The two New York certificates have different eligibility requirements but operate in the same way. That is, they both create a legally enforceable presumption of rehabilitation that "shall not cause *automatic* forfeiture of any license . . . right or privilege" under state law, such as the right to vote, subject to some exceptions. N.Y. Correct. Law § 701(2) (emphasis added). The presumption does not apply to discretionary license renewal or revocation decisions. N.Y. Correct. Law § 701(3); *see also* Radice at 728 (citing N.Y. Legislative Serv., Inc., NEW YORK STATE LEGISLATIVE ANNUAL 1983 254 (1983)). Both certificates may be limited to specific statutory bars, or may relieve a person of all automatic legal prohibitions that stem from her conviction. N.Y. Correct. Law §§ 701(1), 703-a(1). The presumption of rehabilitation is supported by strong enforcement mechanisms. Any person with a criminal record who has been denied a license or employment is entitled, within 30 days of a request, to a

statement setting forth the reasons for the denial.  *Id.* § 754.  A person who believes she is the victim of discrimination based on her conviction may file a claim to enforce the protections above, either through a civil action (against a public employer), or through the New York City Commission on Human Rights (against a private employer).[35]  *Id.* § 755.

Eligibility for the certificates differs based on timing and criminal history.  A person with up to one state or federal felony and any number of misdemeanors can apply for a Certificate of Relief from Disabilities as early as the date of sentencing.  *Id.* §§ 700(1)(a), 702(1).  The sentencing court must either grant the request for a certificate or advise the defendant of her eligibility to apply at a later time.  22 N.Y.C.R.R. § 200.9(b).  If the court issues the certificate at sentencing,[36] all automatic collateral consequences of the conviction are prevented.  If not, the individual may apply to either the sentencing court or the New York Department of Corrections and Community Supervision ("DCCS") for a certificate at a later date.  N.Y. Correct. Law §§ 702-03.  A person who is sentenced to time in a state prison may apply to DCCS for a certificate while incarcerated.  N.Y. Correct. Law § 703(4).  The certificate, if issued, is temporary until the person is discharged from post-release supervision; while the certificate is temporary, it may be revoked for violations of the conditions of that supervision.  *Id.*  A person with multiple convictions on her record needs to apply for a Certificate of Relief from Disabilities for each offense separately.  Radice at 730.

---

[35]     Conviction-based discrimination is unlawful unless it falls under the exceptions described in N.Y. Correct. Law § 752.  *See supra* p. 23.

[36]     Each sentencing court determines its own method of evaluating applications.  In Manhattan, Brooklyn, and the Bronx, judges defer to the courts' respective probation departments to make a recommendation on the application, which is to be included in the presentence reports.  Radice at 729 n.70 (citing Interview with Vincent Schiraldi, Comm'r, N.Y.C. Dep't of Prob., in N.Y.C. (Mar. 2, 2011)).  Judges in Queens consider applications without deferring to the probation department.  *Id.*

Certificates of Good Conduct, on the other hand, may be awarded to people who have more than one state or federal felony conviction after a statutorily defined period of good conduct within a range of one to five years, depending on the most serious conviction. N.Y. Correct. Law § 703-b(3). A person may apply for one certificate that applies to all of her convictions. Radice at 732. Certificates of Good Conduct are issued by DCCS, which is tasked with investigating each application. N.Y. Correct. Law § 703-b(3). The investigation can take four to six weeks, and includes a background check, a home visit, and an interview. Radice at 732. The advantages of the Certificate of Good Conduct include that it strongly incentivizes repeat offenders to refrain from returning to criminal conduct, and that it provides relief that people with more than one felony conviction are ineligible for through the Certificate of Relief from Disabilities.

The standard for issuing either certificate is that the relief granted is "consistent with the rehabilitation" of the applicant and also "consistent with the public interest."[37] N.Y. Correct. Law §§ 702, 703-b. Upon learning of the opportunity, Doe applied for a New York certificate of rehabilitation[38] in 2014. Dep. Tr. 87. Her application was denied in January 2015. *Id.*

However, Doe's application was made and considered without the input of this district's Probation Department. Under the statute, there is a presumption of granting her a certificate upon a recommendation from the chief probation officer of the district where she received a federal conviction:

---

[37] This standard has been criticized as too discretionary and opaque. *See* Radice at 756-61. The state does not provide a mechanism for review of certificate decisions. *Id.* at 761.

[38] She did not specify whether she applied for a Certificate of Relief from Disabilities or for a Certificate of Good Conduct.

> Presumption based on federal recommendation. Where a certificate
> of relief from disabilities is sought . . . on a judgment of conviction
> rendered by a federal district court in this state and the department
> is in receipt of a written recommendation in favor of the issuance of
> such certificate from the chief probation officer of the district, the
> department shall issue the requested certificate, unless it finds that
> the requirements of paragraphs (a), (b) and (c) of subdivision three
> of this section [regarding the rehabilitation of the applicant and the
> public interest] have not been satisfied; or that the interests of justice
> would not be advanced by the issuance of the certificate.

N.Y. Correct. Law § 703(7). I have spoken to our Probation Department, which informed me that our Chief of Probation has decided to recommend in favor of the issuance of a certificate to Doe.

Reentry advocates have praised New York's certificates for their usefulness not only in the employment context, but also in housing, despite the fact that the authorizing statutes do not explicitly address any collateral consequences outside of employment and licensing. Norman at 1015-16. There are a growing number of states that offer certificates of rehabilitation, including: Arizona, Arkansas, California, Connecticut, Georgia, Illinois, Nevada, New Jersey, New York, North Carolina, Ohio, Rhode Island, Tennessee, and Vermont, as well as Washington, D.C.[39] As a state senator, President Obama co-authored the Illinois certificate statute, which is based on the New York program. Radice at 723. It operates in much the same way, but eligibility is limited to individuals with no more than two non-violent felony convictions, and there is no legal presumption of rehabilitation. Norman at 1019-20. In California, certificates serve as the first step in the state pardon process and otherwise create no change in legal status. Radice at 750-51. Nevada awards certificates after at least five years of

---

[39] Eli Hager, *Forgiving v. Forgetting*, The Marshall Project (Mar. 17, 2015), https://www.the marshallproject.org/2015/03/17/forgiving-vs-forgetting#.BivHkXAHT.

release from prison; the certificates expunge a criminal conviction. *Id.* at 751. Mississippi issues certificates for just one purpose: to allow people with criminal records obtain gun permits. *Id.*

### 2. *The Need for a Federal Certificate*

The federal system has much to gain from adopting a certification system similar to those in certain states. The majority of states do not issue certificates, and those that do cannot prevent the imposition of federal collateral consequences. These consequences are not mere trivialities; to the contrary, they bar participation in actions that are fundamental to our national identity. They include ineligibility to enlist in the military, 10 U.S.C. § 504(a), to serve on a federal jury, 28 U.S.C. § 1865(b)(5), and to receive government benefits. *See, e.g.*, 21 U.S.C. §§ 862a(a)-(b); 42 U.S.C. § 13663; 42 U.S.C. § 402(x)(1)(A)(i).

The federal system already contemplates certificates of rehabilitation. *See, e.g.*, Fed. R. Evid. 609(c) ("Evidence of a conviction is not admissible if: (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding that the person has been rehabilitated."); U.S. Sentencing Comm'n, U.S. SENTENCING COMM'N GUIDELINES MANUAL §5J1.1 (2015) (a person convicted of a crime that disqualifies them from participating in a labor union or employment association may submit a petition for exemption to her sentencing judge; "relief shall not be given to aid rehabilitation, but may be granted only following a clear demonstration by the convicted person that he or she has been rehabilitated"). With congressional authorization, a robust federal certification system could include an enforceable presumption of rehabilitation, as is offered in New York, and return federal rights to those with state or federal convictions on their records.[40]

---

[40] Amica contends that a writ of *audita querela* allows a court to discontinue the application of a judgment where there is a legal or equitable *objection* to its continued enforcement. While there may be merit to that argument, I find no reason to issue such a writ here because Doe has not requested that I vacate her judgment entirely, but rather that I delete the record of it. Furthermore, as amica notes, even on a writ of *audita querela*,

In the meantime, the judicial certificate I am awarding Doe will convey to others that the same court that held Doe accountable for her criminal acts has now concluded after careful scrutiny that she is rehabilitated. In other words, the Court is recommending that she be welcomed to participate in society in the ways the rest of us do. The purpose of the certificate is to remove barriers to employment, but I hope Doe will also find it useful to present to landlords, benefits providers, and any others to whom her conviction is significant. If her attorney decides to make an application for a pardon from the President,[41] I believe the certificate will help her make a strong case.

### 3. *Factors Considered in Issuing this Certificate*

In deciding to issue Doe this federal certificate of rehabilitation, I contemplated a number of factors. The following is by no means an exhaustive list, but it includes most of the considerations that influenced my decision.

First, I weighed the nature of Doe's crime. She was convicted of committing non-violent crimes: health care fraud and mail fraud. She participated in a fraudulent scheme, but she did not recruit others or play a supervisory role. Though the health care fraud conviction could obviously signal to nursing employers that she committed a crime on the job, that is not the case. Doe did not benefit monetarily from her crime. No one was physically hurt except possibly for herself and her accomplices.

---

"employers or licensors would not be prohibited from considering the conduct underlying the conviction . . . [b]ut they would be guided in their exercise of discretion by the court's judgment that the conviction itself should no longer constitute a basis for adverse action." Amica Br. at 14-15. I believe the federal certificate of rehabilitation I am issuing to Doe has the same effect without the need for the underlying writ.

[41] I agree with amica that, unfortunately, there has been an increasing inverse relationship between pardon applications and pardons issued in our country. *Id.* at 19-23. In a landscape where the few forms of relief that exist are drying up, there is a pressing need for new provisions of reentry assistance, such as the one I have issued to Doe.

Second, I looked into Doe's current economic and social circumstances. She is a Black woman immigrant from Jamaica of very limited means, who worked to obtain a nursing license in a different country. Doe has two children who, until recently, were dependent upon her financially. She lives in a low-income neighborhood in Jamaica, Queens.

Third, I considered how Doe has spent her time since her release from prison 12 years ago. Most significantly, she has not been convicted of another crime. She has instead been persistent in trying to find gainful employment and contribute to society meaningfully. Her tenacity in overcoming the obstacles imposed on her by law due to her conviction made a strong impression on me, and I believe employers and others should know that.

I evaluated Doe's character when I sentenced her 13 years ago. I have done so again now, focusing not on her long-ago criminal acts but on her efforts to rebuild herself. Considering those efforts along with her life circumstances generally, I conclude that Doe is fit not only be hired by a nursing agency in need of a qualified employee, but she to also be relieved of the long list of collateral consequences she faces under state and federal law. Doe's only important conviction today is her conviction to abstain from criminal conduct and to be a productive member of society. That conviction is most emblematic of who she is today.

CONCLUSION

For the foregoing reasons, I deny Doe's application for expungement relief. This denial is without prejudice to a future application if Doe's circumstances change materially. I have determined that Doe's good conduct following the completion of her sentence merits a certificate of rehabilitation, which I have mailed to her. A copy of the certificate with the

appropriate redaction is attached to this opinion.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 7, 2016
       Brooklyn, New York

# United States District Court for the Eastern District of New York

# CERTIFICATE OF REHABILITATION

I, John Gleeson, United States District Judge for the Eastern District of New York, do hereby certify that

who was convicted in this Court on October 3, 2002, is rehabilitated. I recommend her for employment, housing, benefits, and other opportunities as a full participant in society.

PRESENTED THIS 7th DAY OF MARCH 2016



AGREED TO BY:

_Eileen Kelly_
EILEEN KELLY
CHIEF U.S. PROBATION OFFICER

_John Gleeson_
JOHN GLEESON
U.S. DISTRICT JUDGE